DESESBATS *against* BERQUIER.

IN this case the Register's Court of *Philadelphia* county directed an issue in the Common Pleas to try the validity of a certain writing bearing date the 8th of *August* 1798, purporting to be the will of *Jean Theil* deceased. The issue was accordingly formed in the Common Pleas, and removed by *certiorari* into this court, where the following case was made for the court's opinion.

"It is a feigned issue from the Register's Court to try "the validity of a certain paper writing purporting to be the "will of *Jean Theil* deceased. It is admitted that *the said* "*instrument, if it had been made by a citizen of Pennsylvania,* "*would be a will, and that if the testator had been a citizen* "*of the said state, the property bequeathed therein would* "*have passed thereby.* On the other side it is admitted that the "said *Jean Theil* was an *inhabitant of Jeremie* in the island "of *St. Domingo, and a subject of France, at the time of ma-* "*king the said instrument; that he continued to reside there till* "*the time of his death, and that by the laws of the said island* "*the said instrument is not, nor was at the time it was made* "*nor since, a last will and testament;* and that the said *Jean* "*Theil,* unless this instrument is established as a will, died in- "testate. That the property intended to pass by the said instru-

" ment, *which is all personal property*, was at the time of mak-
" ing thereof, and hitherto has remained and still remains, in the
" *hands of persons resident in and citizens of Pennsylvania.* That
" Mr. *Desesbats* the plaintiff was at the time of making the
" said instrument an inhabitant of *St. Domingo*, but at the time
" of the death of the said *Jean Theil*, was an inhabitant of the
" island of *Jamaica.* If the court shall be of opinion that the
" instrument aforesaid under the above circumstances is to be
" considered in *Pennsylvania* as the will of the said *Jean Theil*,
" then the probate thereof taken by consent in the register's
" office in and for the city and county of *Philadelphia*, to stand
" valid, it being admitted to be in due form according to the
" laws of *Pennsylvania;* otherwise judgment to be rendered
" for the defendant, and the said probate to be null and void."

*Tod* and *Hare* argued for the plaintiff. The single question
is whether a will in perfect conformity with the law of *Penn-
sylvania*, is effectual to pass personal property situated here, the
testator being a foreign subject domiciled in *St. Domingo*,
where the will was made, and by the law of which country it is
void. The question is a new one, and is not involved in any of
the *English* decisions upon intestate succession. These deci-
sions have merely settled the law, that in case of an intestacy,
the law of the intestate's domicil must regulate the distribution
of his personal property; a doctrine, that were it now for the
first time to be discussed, would encounter many objections.
But it proceeds in part upon a principle which sustains the pre-
sent will: namely, that since all succession *ab intestato* is ground-
ed on the presumed will of the deceased, his estate ought to de-
scend to him whom the law of his own country calls to the suc-
cession, as the person whom it presumes to be most favoured
by the intestate. 2 *Erskine's Inst.* 696. Or in other words, that
where a will is not expressed, the law of the domicil is raised
up to execute a presumed will. Where, however, a will is ex-
pressed, the presumption in favour of the law of the domicil never
arises; that law is overlooked, and the law referred to by the tes-
tator must govern his testamentary arrangement both in form
and substance. Indeed where the presumption in favour of the
domiciliary law is rebutted by the act of making a will, foreign
courts have demanded that the will should conform to the law
of the place where the goods were situated, or otherwise to be

1808.

DESES-
BATS
*v.*
BERQUIER.

without effect. Thus in *England* a bastard enjoys the privilege of making a testament, which does not obtain in *Scotland;* and accordingly notwithstanding such a testament is made, his moveables in *Scotland* escheat to the crown. 2 *Lord Kaimes Pr. Eq.* 335. Here the will is not set aside to let in the law of the domicil, which would give the goods to an administrator to pay debts, to be in trust for children, or if he had none, then for the ordinary, but that law being overlooked, the goods escheat to the crown. So in *England* a *nuncupative* will is sustained, but it will not carry *Scotch* moveables; for by the law of *Scotland,* which is the only rule to be followed since there is no presumption in favour of the domiciliary law, writing is essential to convey moveables from the dead to the living. 2 *Lord Kaimes* 335. The cases from which Lord *Kaimes* has extracted these principles, have therefore decided, that in the event of an express will, the testator must be such a person as by the law of the country where the moveables are situated is competent to execute the instrument, and the will such in point of formality as the law of the country recognises. This may be going too far. It may be very hard in certain cases to demand this conformity; but a perfectly safe rule is to give effect to the law of the domicil both in form and substance in order to execute a will, but never for the purpose of overthrowing it. This conformity of the will to the law of the place where the goods are, has certainly existed without being thought of bad consequence. In *Bowaman* v. *Reeve*, (a) where a native of *Holland* made his will there, and died possessed of personal estate in *England*, the will was proved in the latter country, which it could not have been, if it was not in conformity with the *English* law; and in 11 *Vin.* 58. *pl.* 6. it is stated to have been given in charge to a jury by Justices *Doderidge* and *Chamberlain*, that if a will of goods in *England* be made in *France* and proved there, the executor shall not have action on this probate, but ought to prove it in *England*.

It being then a question in which the law of the domicil has no influence to defeat us, it is proper to urge the analogy between this case, and 1. cases of foreign contracts; 2. cases of mere remedy in the courts of the country where property or debtor is situated; and 3. cases of statutory transfers of property.

(*a*) *Prec. in Chan.* 577.

1. It is true that the *lex loci* almost invariably governs, where such is the intention of the parties. But it cannot be disputed, that where a contract is made with reference to another country, the law of the country referred to shall govern, and not the law of the place. *Robinson* v. *Bland.* (*a*) Thus in *Sir John Champant* v. *Lord Ranelagh* (*b*) a bond was made in *England* and sent over to *Ireland* where the money was to be paid, but the kind of interest was not mentioned; the Lord *Keeper* was of opinion that it should carry *Irish* interest. 1 *Eq. Abr.* 286. Now there is nothing in a *Contract* strictly so called, that incorporates or rejects the *lex loci* more than any other disposition of property, such as a gift or a will. " In every *disposition* or " contract where the subject matter relates locally to *England*" says Lord *Mansfield* in *Robinson* and *Bland*, " the law of *Eng-* " *land* must govern, and must have been *intended* to govern;" and he illustrates his position by a contract concerning *stocks*, which notoriously follow the law of the domicil in the case of intestacy, as well as by a mortgage and a conveyance of land. The question always is, what was the intention of the party? By what law did he intend his contract or disposition to be tested? That law and that alone shall govern. If personal property has no *situs*, it must be transferred by contract as well as by will, agreeably to the domiciliary law, or the opposite argument falls; for that argument is that moveables follow the person, and are with him where he dies, therefore the will must be such as is good in that place. But then it must be true of contracts in the life of the party as well as of wills; for the fiction does not depend upon the proprietor's death. Now it is clearly untrue as it respects contracts; for by referring to the laws of a foreign country they embody them, and are controlled thereby both in form and substance. There are instances in which an instrument or contract, invalid in the country where it is executed, has been enforced in a foreign country to whose law it conformed; as in the case of stamps; and even agreements abroad, which after having been carried into effect by one of the parties, would have been there the ground of a capital prosecution, have been enforced against the other party in *England*. *Borr* v. *Vandall* (*c*), *Smith* v. *Oxenden.* (*d*)

1808.

———

DESES-
·BATS
*v.*
BERQUIER.

---

(*a*) 2 *Burr.* 1079.      (*c*) 1 *Cha. Ca.* 30.
(*b*) *Pre. in Chan.* 128.      (*d*) *Ib.* 25.

2. In those cases where the question is merely a question of remedy, the law of the country where the remedy is asked must universally govern; the party must take his remedy upon such terms as the courts of the country will give it to him. This is another principle in restraint of that comity on which the defendant must rely. Thus if a debt be contracted in *England*, and sued in *Scotland*, the *English* statute of limitations is no bar; 2 *Lord Kaimes* 354.; and in *Nash* v. *Tupper*, (a) where a note was given in *Connecticut*, whose limitation is seventeen years, the statute of *New York*, which limits the bringing of suit to six years after action accrued, was pleaded and the plea sustained. So in *Duplein* v. *De Roven.* (b) These cases shew that what might be considered as an ingredient in the foreign contract, that is the statute of limitations, is entirely overlooked the instant the parties enter the court of another country.

3. Statutory transfers of property have no effect out of the country where they are made. A statute of *Great Britain* may order a conveyance from a bankrupt of all his moveables, and call it a voluntary conveyance, but it will not transfer his moveables in *Scotland*. 2 *Lord Kaimes* 362. Now if comity to foreign nations will in any case support a transfer which does not conform to our law, it must be where that transfer is peculiarly the act of the nation; but here the foreign country refuses it; *à fortiori* will it refuse to defeat a transfer, simply because it is not agreeable to the law of the domicil, when the property is in its own country, and the transfer consistent with all its laws.

There are no cases which militate against the application of these arguments. All that is found in the *English* law, relates to intestate succession. The opinion of foreign jurists is to be received with great caution; they write with reference to or under the bias of their own national institutes of law. *Huberus* in particular, who has feigned a case for argument similar to this, is spoken of with little respect in 1 *Collec. Jurid.* 116.; and every lawyer knows the difference between an opinion formed and defended in the closet, and the judgment of a court pronounced after solemn argument and deliberation. The dutchess of *Kingston's* will, which has been much spoken of, and the circumstances of which are given in 1 *Collect. Jurid.* 323. does

(a) 1 *New York T. R.* 402.          (b) 2 *Vern.* 540.

not touch the present question. Her will was executed according to the law of her domicil, which was in *England*, and *Target* was of opinion it was good in *France*. Our argument is, that although the law of the domicil may be called in to support a will, it shall not be used to overthrow it.

*Duponceau* for the defendant. Whatever may formerly have been the objections to the rule which must govern this case, it is now a rule of property as well established as any in our system; and it is one and the same rule in the case of an intestacy, and in the case of a last will. The maxim on which it is founded has the assent of all nations, *mobilia personam sequuntur*, *immobilia situm;* and therefore to every purpose connected with this question, the personal property of *Jean Theil* must be considered as accompanying his person at the time of his death, and not to be disposed of by any will, that would not have passed property actually situated in *Jeremie.* " It is a " clear proposition," says Lord *Loughborough* in delivering the opinion of the court in *Sill* v. *Worswick*, " not only of the law " of *England*, but of every country in the world where law has " the semblance of science, that personal property has no loca- " lity. The meaning of that is, not that personal property has " no visible locality, but that it is subject to that law which " governs the person of the owner. With respect to the dispo- " sition of it, with respect to the transmission of it either by " succession, *or the act of the party*, it follows the law of the " person. If he dies, it is not the law of the country in which " the property is, but the law of the country in which he is, that " must regulate the succession." 1 *H. Black.* 690. These sentiments are confirmed by Lord Chancellor *Thurlowe* in *Bruce* v. *Bruce*, " Personal property follows the person of the owner, " and in case of his decease, must go according to the law of " the country where he had his domicil; for the actual *situs* " of the goods has no influence." 2 *Bos. and Pul.* 231. It is in this case that we find a commentary upon the principles of *Scotch* law, cited from Lord *Kaimes;* principles that are there and in subsequent cases expressly overruled, and stated to have been framed by following the *lex loci rei sitæ*, in opposition to the rules of the civil law and the *jus gentium*, which give an exclusive consideration to the law of the domicil. But even Lord *Kaimes* can see the sense of the rule which regulates

the succession to a *Scotchman's* moveables, both at home and abroad, according to the *Scotch* law; and the error of limiting this rule to a *Scotchman*, is now finally corrected in that country by *Bruce* and *Bruce*.

These principles alone would defeat the plaintiff's claim; for most clearly the will in this case would have been good for nothing, if the property had actually been in *Jeremie*. But it is said they apply to the case of an intestacy, and to cases in which the law and not the party makes the regulation. The precise question has perhaps never been litigated in *England;* but the opinions of learned men whose writings are respected by all the world, and are received as authority on this subject as a branch of the law of nations, are conclusive of the point. In *Holland* a last will and testament may be made before a notary and two witnesses; in *Friezeland* it is of no effect unless established and witnessed by seven witnesses. A *Frizian* makes his will in his own country before a notary with two witnesses, and it is carried into *Holland* and demand made of the goods found there; " it will not be granted," says *Huberus* " because not made in " a valid manner at first, being made contrary to the laws of " the place." *Hub. vol.* 2. *B.* 1. *Tit.* 3. *p.* 26. 3 *Dall.* 372. This is exactly our case. *Vattel* says, " The validity of a testa- " ment, as to its form, can only be decided by the judge of the " domicil, whose sentence delivered in form ought to be every " where acknowledged." *B.* 2. *sec.* 85.; and in *Denizart's Collection de Decisions, Tom.* iv. *p.* 515., we have a confirmation of the same principle in terms still more explicit. " Mais ce " n'est pas assez que la volonté du testateur ait été libre et " saine, il faut encore qu'elle ait été exprimée avec les formes " qu'exige la loi du domicile dans lequel le testament a été " fait;" his will *must be expressed in the form required by the law of the domicil, in which the testament has been made.* To the same purpose is 2 *Wolf.* 201. The opinion of Monsieur *Target* on the dutchess of *Kingston's* will, is on the same side. The dutchess of *Kingston* was an *Englishwoman*, who was authorized by the king of *France* to acquire property in that kingdom, and to dispose of it by gift, last will, or otherwise. She never abdicated her country or her home, but she resided and died in *France*. Her will was made in conformity with the law of *England;* but had she been obliged to follow the form established by the custom of *Paris*, it would have been null. Mr.

*Target*, who examines the question with great ability, gives it as his decided opinion, that " as soon as she had fulfilled the " formality prescribed by the law of her country, it must be " concluded that the form of her will was regular." 1 *Collect. Jurid.* 329. In fact it being settled by the cases of *Bruce* v. *Bruce, Ommaney* v. *Bingham,* and *Somerville* v. *Lord Somerville, (a)* that the *lex loci rei sitæ* is in personal property completely out of the question, and that the succession *ab intestato* must be according to the law of the intestate's domicil, what possible argument can there be for introducing a different rule in the case of a last will, and treating moveables in this single instance as fixed to the country where they happen to be? The notion would be productive of infinite mischief. One man in a thousand may not know the law of last wills in a foreign country, but all men know it, or may easily know it, in their own. Where one will is maintained by the doctrine, many must be overthrown; and in case of personal possessions in several countries whose laws are different, the testator must either die intestate of part of his property, or execute a will to incorporate all their varying forms, which may be impossible.

Analogy is at all times a dangerous argument in the law. In the argument of the plaintiff it derives all its weight from a misconception of the true question. This is not a case of *foreign* contract or disposition where the subject matter relates locally to *Pennsylvania;* it is a question whether property situated in contemplation of law in a foreign country, can be disposed of by a will which is void by the laws of that country. Neither is it a question of remedy to which the cases cited apply; it is a question of title in the plaintiff which stands or falls with the instrument under which he claims; and the objection is not that the mode of enforcing his rights is or is not agreeable to the foreign law, but that he has no right of any kind. Finally it is not a question whether any law of a foreign country shall have an extraterritorial force, although it is most evident that by a comity which is essential to the well being of the world, this effect is frequently permitted; but it is a question whether personal property is not by the understanding of every civilian and common lawyer in existence appurtenant to the person, the person always connected with his domicil, and the law of the

*(a)* 5 *Vez. jr.* 750.

1808.

DESES-
BATS
v.
BERQUIER.

domicil operating therefore upon the personal property by virtue of its own intrinsic unquestionable authority.

TILGHMAN C. J. This case was very well argued. Every thing that ingenuity and industry could produce was brought before the court. If the case had been entirely new, it would have been extremely difficult to decide. But although no authority directly in point has been produced, yet some principles have been established by adjudged cases, which bear strongly on the question before us. It seems to have been formerly taken for law in *Scotland*, that the goods found *there* of a person who died intestate in *England*, should be distributed according to the *Scotch* law. But since the cases of *Bruce* v. *Bruce*, *Ommaney* v. *Bingham* and *Somerville* v. *Lord Somerville*, it must be considered as settled that " the succession to the " personal estate of an intestate is to be regulated according to " the law of the country of which he was a domiciliated inhabi- " tant at the time of his death." If this is the rule in case of intestacy, why should not the same rule prevail with respect to *last wills?* It is only with the view to promote the general convenience and happiness of mankind, that any country allows the laws of a foreign nation to operate in any instance on property within its territory. It is supposed that every man is best acquainted with the law of his own country, and that when he dies intestate, it is his desire and expectation that his personal property wherever situated, should be distributed according to that law; and to gratify this reasonable desire, it is the practice of civilized nations to extend their courtesy towards each other so far as to permit the law of the domicil of the intestate to prevail. This the counsel for the plaintiff candidly admit. But they contend that the establishment of the will of *Jean Theil* will answer the purpose which should always be kept in view, that is to say, it will carry the wishes of the foreigner into effect. It is very true that in this instance it will; but we must take care how we establish a principle, which at the same time that it carries the will of *one* man into effect, may tend to destroy the will of one hundred others. If we say that the will shall stand good because it is agreeable to our law, although contrary to the law of the testator's domicil, then we establish the principle that with regard to last wills, the law of *Pennsylvania*, and not the law of the domicil, shall prevail. It will follow that

the wills of foreigners, made according to the law of their own country, are to have no effect on moveable property found here, unless they are agreeable to our law. This may produce very mischievous consequences, not only to foreigners who have property here, but to our own citizens who may have property abroad. For we must expect that other nations will pay no greater regard to us, than we pay to them. We are a commercial people, and should be forward in reciprocating those acts of courtesy which the nations of *Europe* are in the habit of practising. Indeed we have always been sensible of the importance of paying a high regard to the law of nations. It is considered as incorporated with, and forming a part of, our common law. (1 *Dall.* 114. *Respub.* v. *De Longchamp.*) Where a debt due from one *Englishman* to *another* has been discharged by a commission of bankrupt in *England*, we recognise such discharge here. *England* pays the same regard to the bankrupt laws of other nations, as appears by the case of *Potter &c.* v. *Brown, 5 East.* 124., where Lord C. J. *Ellenborough* in delivering his opinion says " it is every day's experience to recognise the laws of fo- " reign nations as binding on personal property; as on the sale " of ships condemned as prize by the sentence of foreign courts, " and the succession to personal property *by will* or intestacy, of " the subjects of foreign countries." Let us now examine what is the conduct of *France* (for *Theil* was a subject of *France*) in cases of this kind. *France* recognises the bankrupt laws of other countries. We find that the dutchess of *Kingston*'s will, made in *France* according to the law of *England*, was held good, for the disposition of her moveable property in *France. Collect. Jurid.* 242. 26th *Oct.* 1786. And the case from 4 *Denizart Testament* 515. asserts the principle that the will must be according to the law of the domicil. No cases were cited to shew that any respectable nation held different sentiments; and I think it may be concluded from a full view of the subject, that to regulate the disposition of the moveable property of deceased persons according to the law of their domicil, whether they die testate or intestate, is best calculated to promote the general convenience of the world, and most agreeable to those principles which have been established by judicial decisions among the most enlightened nations. I am therefore of opinion that the paper set up for the will of *Jean Theil* is not a valid will, and that judgment be entered for the defendant.

1808.

DESES-
BATS
*v.*
BERQUIER.

1808.

DESES-
BATS
*v.*
BERQUIER.

YEATES J. It has been remarked by *Lord Chancellor Lough-borough* (a) that if the question whether the domicil of the party deceased should decide upon the succession to his personal property, was quite new and open, the point appeared to him susceptible of a great deal of argument. Numerous decisions in the Court of Session in *Scotland,* with one single exception, asserted the negative of that proposition. The different authorities on this head are collected in a note subjoined to *Bruce* v. *Bruce* reported in 2 *Bos.* and *Pul.* 129. But the point is now settled by cases (b) determined in the *British* House of Peers.

The master of the rolls, Sir *Richard Pepper Arden* (c) in 1801 has deduced the three following rules, as the result of the different authorities on the subject. 1st, That the succession to the personal estate of an intestate is to be regulated by the law of the country in which he was a domiciled inhabitant at the time of his death, without any regard whatever to the place either of the birth or the death, or the situation of the property at that time. 2dly, That though a man may have two domicils for some purposes, he can have only one for the purpose of succession; and 3dly, that the *forum originis* is to prevail until the party has not only acquired another, but has manifested and carried into execution an intention of abandoning his former domicil, and taking another as his sole domicil.

The domicil by the civil law is there described " *ubi quis la-* " *rem rerumque ac fortunarum suarum summam constituit.*" But Sir *Richard* censured this definition as too vague and difficult of application; and thought *Bynkershoek* was very wise in not hazarding a definition of the term.

The counsel for the plaintiff in this case in the course of their arguments have not denied the authority of these rules; but they have contended that they apply only to cases of persons dying intestate, where according to 2 *Erskine* 697 the law of the domicil is considered as the presumed will of the party, and declaratory of his intention; and that the same ought not and cannot possibly control the solemn intention of the party

(a) 3 *Vez. jr.* 200.

(b) 3 *Vez. jr.* 200. 2 *Bos. and Pul.* 229. 1 *H. Bl.* 690. 5 *Vez. jr.* 786. 4 *T. R* 184. *where all the authorities in the civil law are cited.*

(c) 5 *Vez. jr.* 786.

declared by his last will to take effect after his death. I have
no hesitation in asserting that the ingenious observations of
those gentlemen struck me forcibly at the time; and my ideas
of the justice and equity of the plaintiff's claim powerfully in-
creased the effect of those first impressions. But on a fuller
research of the books and more mature deliberation, I felt my-
self constrained to abandon my private opinion of the supposed
honesty of the plaintiff's demand. This part of the *lex gentium*
is founded on the mutual courtesy of independent governments,
looking forward to the common advantages and good harmony
of civilized nations. The principle equally applies, whether the
individual makes a will or not in a foreign country. The goods
of individuals in their totality ought to be considered as the
goods of the nation in regard to other states. They in some
sort really belong to it, from the right it has over the goods of
its citizens; because they make a part of the sum total of its
riches and augment its power; and because a nation has an in-
terest in the protection it owes to its members. The foreign
jurists, *Vattel* (a), *Huberus* (b), *Wolfe* (c), *Denizart* (d), *Tar-
get* (e), and Lord *Kaimes* (f), severally assert that the law of the
domicil shall govern as to the regulation of the moveable pro-
perty of a subject or citizen dying in a foreign country; and
that the validity of his testament as to its *form* can only be de-
cided by the judge of the domicil, whose sentence delivered in
form ought to be every where acknowledged. It has been said
that Sir *James Marriott* has spoken lightly of the *prælections* of
*Huber;* but it is well known that Lord *Mansfield* has cited his
work with approbation; and Mr. *Hargrave* (g) has declared
that his writings on the civil law are much esteemed. Accord-
ing to Lord Chancellor *Thurlowe* in *Bruce* v. *Bruce* (h) decided
in the *British* House of Lords in *April* 1790, (i) personal pro-
perty follows the person of the owner, and in case of his *de-
cease*, must go according to the law of the country where he had
his domicil; for the actual *situs* of the goods has no influence.

*1808.*

DESES-
BATS
*v.*
BERQUIER.

---

(a) *Vattel,* 154. *s.* 85.                  (f) *Princ. Equ.* 356. *lib.* 3. *c.* 8. *sec.* 3.

(b) *Huberus, Vol.* 2. *lib.* 1. *tit.* 3.      (g) *Co. Litt.* 80. *b. Hargrave's note.*

(c) ? *Wolfe,* 201.                          (h) 2 *Bos. & Pul.* 229. *in notis.*

(d) *Denizart,* 4 *Tit. Testament.* 515.    (i) 2 *Bos. & Pul.* 230, 231.

(e) *Collect. Jurid.* 242. (324.)

1808.

DESES-
BATS
*v.*
BERQUIER.

Lord Chief Justice *Kenyon* in 1791 has said (*a*) generally speaking it must be admitted that personal property must be governed by the laws of that country where the owner is domiciled. Lord Chancellor *Loughborough* in 1796 has declared (*b*) that it is now fixt law that the law of the country where the domicil is decides, wherever the personal property is situated. According to Sir *Richard Pepper Arden* in 1801, (*c*) there is not a single *dictum* from which it can be supposed that the place of the death shall make any difference. It is evident therefore that by the law of nations as well as by the *British* decisions the general rule *at least* is clearly established to be in favour of the defendant; and it was incumbent on the plaintiff to shew that the making of a will under the circumstances of this case formed an exception. This has not been done; and it cannot be said with propriety that when the word *succession* is made use of without a particular reference to an intestacy, that it necessarily excludes the taking under a will. But we have more; we have an authority in point. In (*d*) *Sill* v. *Worswick* determined in 1791, we find that Lord Chief Justice *Loughborough* expresses himself in these strong terms: " It is a clear proposition not " only of the law of *England* but of every country in the world, " where law has the semblance of science, that personal proper- " ty has no locality; with respect to the disposition of it, with " respect to the transmission of it, either by *succession* or by " the *act of the party*, it follows the law of the person." Of the signification of the words, *act of the party*, there can be no doubt. The transmission of a man's property to others arises from civil institutions, and is the subject matter of positive law. My former feelings on the justice and equity of the plaintiff's claim have been repressed by considerations of the imperious necessity of our strict adherence to uniform established rules. In *Bempde* v. *Johnson* already cited, Lord *Loughborough* declared the case of Sir *Charles Douglas* came before the House of Lords under circumstances that affected the feelings of every one; for the consequences of the judgment which the House of Lords found themselves obliged to give, were both *harsh*

(*a*) 4 *T. R.* 192.          (*c*) 5 *Vez. jr.* 788.
(*b*) 3 *Vez. jr.* 200.          (*d*) 1 *H. Bl.* 690.

and *cruel;* and if the particular circumstances raising very just
.sentiments in every mind, could prevail against the uniformity
of the rule it is so much the duty of courts of justice to estab-
lish, there could be no case in which the feelings would have
ed one further.

On the whole matter I find myself constrained to deliver my
opinion, that judgment should be entered for the defendant.

SMITH J. concurred.

BRACKENRIDGE J. Subsequent to the argument in this case
I examined the authorities cited, and the civilians generally on
the subject. An abstract of the investigation with my conclu-
sion has been mislaid, and cannot now be recurred to. But it
will suffice to say, at this time, that my conclusion was decisively
against the will, and in favour of the successor *ab intestato.* (*a*)

Judgment for defendant.

(*a*) The case of *Desesbats* v. *Berquier,* which decides the effect of *domicil*
upon a will of moveables, and the following case of *Guier* and *O'Daniel,* which
contains a very full exposition of the principles by which *domicil* is ascer-
tained, are the only cases in *Pennsylvania* in which these questions have
been solemnly discussed and settled. The reporter is therefore induced to
connect them in this manner.

The case arose in the Orphan's Court for the city and county of *Philadel-
phia,* between

STEPHEN GUIER, claiming as the father of THOMAS GUIER deceased in-
testate, and FRANCIS O'DANIEL and WILLIAM YOUNG, claiming on
behalf of the brothers and sisters of the intestate.

THE sum of 1400 dollars was in dispute under the following circum-
stances. *Thomas Guier,* the intestate, was the captain of a vessel, and was
murdered in the *West Indies* in 1801. The money in controversy was part of
the proceeds of certain coffee which came to *Philadelphia,* and was sold on
his account after his death. *O'Daniel* and *Young* claimed it for his brother
and sisters by the law of *Delaware;* the father claimed it for himself by the
law of *Pennsylvania;* and the question for the Court was, by which law the
distribution should be directed.

The facts were these: *Stephen Guier* the father, and his family, including
the intestate at that time a minor, removed from the state of *Connecticut* to
*Delaware* in *March* 1795; where they settled on a farm belonging to his son
*Gideon,* who was already resident there. In the same year *Thomas* sailed
from *Wilmington* in *Delaware,* as a sailor in a vessel commanded by *Gideon;*

1808.

Lessee of NEFF *against* NEFF.

It is not ne-
cessary to
entitle a
party to a
special jury
that the at-
torney should
certify that
it is not in-
tended for
delay. There
is no time
limited with-
in which a
party must
apply for a
special jury.

THIS was a motion by *Rush* and *Hopkinson* for the defen-
dant, to remove this cause from the general to the special
jury list, although it had been more than three years at issue.
They relied on the acts of Assembly 2 *St. Laws* 267. 691., which
entitle parties to a special jury, and put no limit to the time of ap-
plying for it; and also on a case between *Hall* and *Vandegrift* at
the last term, in which the court allowed the change to be made,
after the cause had been several years on the general jury list.
It was essential they said in this case, because the controversy
had interested a large community, and it was highly probable
from the mode of returning a general jury, the defendant might
have on the pannel some of his decided opponents.

and constantly afterwards followed the sea. In a second voyage with *Gideon*
from *Wilmington*, he was cast away, and returned to *Wilmington*. In the winter
of 1796 he lived in *Gideon's* house in *Wilmington*, and there went to school to
learn navigation. In *March* 1797, he took a protection from the Collector of
*Philadelphia* and sailed from that port. From 1796 to 1798, during some part
of which period he was of age, he always boarded when ashore with *Gideon's*
widow in *Wilmington*, where he kept his trunks, clothes, books, and papers;
and from 1798 to 1800 he boarded when ashore at an inn in the same town.
In 1800 he became a member of a Freemason's Lodge at *Wilmington*, and
contributed his proportion of the room-rent. In the summer of 1801 he went
to *Connecticut* on a visit to his relations; but, except in 1797 when he sailed
from *Philadelphia*, and once when he sailed from *New-York*, all his voyages
from 1795 to 1801 began at *Wilmington*, during which period he was succes-
sively seaman, mate, and captain. All his owners resided at *Wilmington*. The
protection from the Collector at *Philadelphia* stated him to be twenty three
years of age; but several witnesses swore to his being under age when he
first went to *Delaware*. The bank of *Wilmington* required two indorsers on
his notes, as they did on the notes of all non-residents; and he never owned
or rented a house, had never been assessed or paid a tax, nor ever voted at
an election in the state of *Delaware*, though he once offered his vote and it
was rejected. In 1801 he sailed and never returned. The sum in dispute had
never been in *Delaware*, the coffee from which it proceeded having come
direct from the *West Indies* to *Philadelphia*.

*C. J. Ingersoll* for the father, argued it upon three points. 1. That *Thomas
Guier* had no *domicil* any where. 2. That where there is no *domicil* of prefer-
ence, custom and the law of *Pennsylvania* establish the *lex loci rei sitæ* as the
rule of succession to personal as well as to real property. 3. That the *locus
rei sitæ* being *Pennsylvania*, and no *domicil* of preference being shewn else-
where, by the law of *Pennsylvania* the father was entitled to the succession.

*Hopkinson* and *Rodney* for the *Delaware* claimants.

*Wallace* opposed the motion on this ground, that the agreement of the attornies of this Court, which had been made a rule of the court, demanded as a prerequisite to a special jury, that the attorney should certify it was not intended for delay. It was true that no affidavit of defence was required by law in an action of ejectment, but the certificate was an independent matter. Here delay would be the consequence from the known state of the special jury list, the defendant had been negligent in not making an earlier application, and there was no certificate.

Per CURIAM. The certificate is not required by the act of Assembly, and the rights of the parties are to be tested by that. The law limits no time for an application of this kind, and as the court thought proper to allow it in the case alluded to, it is essential to uniformity of decision that the motion should be granted.

1808.
———
Lessee
of
NEFF
*v.*
NEFF.

On the 7th *July* 1806, the opinion of the Court was delivered by

R USH President. The case is embarrassed with little or no difficulty, whether considered on legal principles or matters of fact. The question is, where was he domiciled at the time of his death? and by what law shall the personal estate be distributed?

It is necessary to state both the law and the facts briefly. The position is too clear to be controverted, that personal estate must go according to the laws of the country in which a man is domiciled at the time of his death. There can be but one domicil for the purpose of distributing personal estate; and when that is ascertained, all such property wherever dispersed, will go in succession according to the laws of the country in which the intestate was *last* domiciled. Debts, having no *situs*, follow the person of the creditor; and the *lex loci rei sitæ* is with great propriety totally disregarded.

*A man is prima facie domiciled at the place where he is resident at the time of his death;* and it is incumbent on those who deny it, to repel this presumption of law, which may be done in several ways. It may be shewn that the intestate was there as a traveller, or on some particular business, or on a visit, or for the sake of health; any of which circumstances will remove the presumption that he was domiciled at the *place* of his death. 1. *Bos. and Pul.* 230.

On a question of domicil the mode of living is not material, whether on rent, at lodgings, or in the house of a friend. The apparent or avowed intention of *constant* residence, not the manner of it, constitutes the domicil.

Minute circumstances in inquiries of this sort are taken into consideration. the immediate employment of the intestate, his general pursuits and habits in life, his friends and connexions, are circumstances which, thrown into the scale, may give it a decisive preponderance.

There is no fixed period of time necessary to create a domicil. It may be acquired after the shortest residence under certain circumstances; and under others, the longest residence may be insufficient for the purpose.

GODSHALL *against* MARIAM.

The regulation of a lot by regulators under the act of 9th March 1771, from which no appeal is entered to the next Common Pleas, is conclusive as to the foundations and party walls of buildings erected conformably thereto; but not so as to the lines of the lot upon which there are no buildings.

THIS was an action of trespass to recover damages from the defendant for breaking and entering the plaintiff's close, and removing five pannels of fence. The defendant pleaded not guilty, and *liberum tenementum.* Upon the trial before the Chief Justice at *Nisi Prius* in *June* 1806, the plaintiff proved a regular title to a lot of twenty feet in breadth by one hundred and ten feet in depth, on Third street in the *Northern Liberties,* which lot was stated in a deed bearing date the 15th *November* 1794, from Dr. *John Redman* to the person under whom the plaintiff claimed, to be " bounded *northward* " *by a thirty five feet corner lot,* granted or intended to be " granted by the said *John Redman* to *Adam Logan.*" He also shewed that his lot was duly regulated on the 25th *July* 1798, by the proper officers under the act of 9th *March* 1771, by marking the lines in front and in rear, and putting stakes at all the corners; that the owner of the Northern lot had knowledge of the regulation; that there had been no appeal from any order

*Bynkershoek,* we are told, would not venture to define a domicil. *Vattel* says, it is a fixed residence, with an intention of always staying there. It may be defined, in our opinion, to be *a residence at a particular place accompanied with positive or presumptive proof of continuing it an unlimited time;* and is the conclusion of law on an extended view of facts and circumstances. The determination in the case of Major *Bruce* in the House of Lords does not militate with any part of this definition. *Bruce* left *Scotland* when very young, and became completely domiciled in the *East Indies,* in word and in deed, by a residence of sixteen or seventeen years. Towards the close of his life, and after making a fortune, he expressed a resolution of spending the remainder of his days in his native country, and accordingly took measures to send his property before him, when he suddenly died. It was held that he was clearly domiciled in the *East Indies* in the first instance, and that the intention to change could have no effect. Though declarations are good evidence that a person has changed his domicil, no fixed views of that sort can be supposed equivalent to the actual abandonment of one domicil, and the acquisition of another.

. The domicil of origin arises from birth and connexions. *A minor during pupillage cannot acquire a domicil of his own. His domicil therefore follows that of his father, and remains until he acquires another, which he cannot do until he becomes a person sui juris.*

With respect to the facts in the case before us, *Thomas Guier* left *Connecticut* in the year 1795, under age, in company with his father *Stephen,* who, quitting his native country, migrated to *Delaware,* and became a resident of that state by acts of the most unequivocal nature. There cannot be the least

of the regulators; that the plaintiff had built a brick house con- formably with the regulation, twenty feet in front and about twenty five feet deep, and that he erected the fence in a line with the side of his house. The trespass complained of, was the defendant's taking up this fence and setting it down in the plaintiff's lot, about two feet six inches within the line of regulation.

The defendant shewed title to the before mentioned corner lot of thirty five feet, under a deed from *Redman* to *Logan* of 15th *November* 1794, in which it was said to be bounded " north- " ward by *Coates's street.*" He then gave in evidence a regulation of the cross streets in the *Northern Liberties*, commenced before the regulation of the plaintiff's lot, but not published and confirmed until the 5th *August* 1799. This regulation had no connexion with the regulation of lots, but was a distinct thing, authorized by an act of 17th *April* 1795; and the sur-

---

doubt that the father became domiciled there. His son *Gideon* was the harbinger of the family, and was actually a resident in *Delaware* in the year 1792, when he was a married man, a housekeeper, and the commander of a vessel. Induced probably by the establishment of his son in that part of the world, the old man followed his fortunes, and settling under his immediate auspices, became a farmer; a mode of life in itself more indicative than any other of views of permanent residence. The father being thus domiciled in *Delaware*, his minor son *Thomas* was domiciled there also, who while under age never acquired or could acquire a domicil *sui juris*. If it were a point of doubtful decision whether *Thomas* was ever domiciled by any action of his own, *Delaware* would of course be his *domicilium originis*, and the country whose law would regulate the succession to his personal estate.

But we do not rest his domicil in *Delaware* on this ground: he acquired one of his own. From the time old *Guier* and family, with his son *Thomas*, arrived in *Delaware*, they seem to have been connected with *Gideon Guier*, and to have been both in some degree dependent upon him. He settled his father on a plantation, and *Thomas* became his apprentice in the seafaring business. Having served out his time, he received wages from his brother. About the year 1797 *Thomas* was shipwrecked, and returning by the way of *New York*, he proceeded not to *Connecticut* but to *Wilmington*. He studied navigation after he was of age in the borough of *Wilmington*. His diligence and good conduct recommended him to notice. In a year or two he became a mate, then a captain and part owner of a vessel, in which character he sailed in 1801, when he was murdered by the blacks in the island of *St. Domingo*. During this whole period we hear nothing from him of the *animus revertendi*. So far from it, that after paying a visit to his friends in *Connecticut* in 1800 or 1801, he hastened back to *Wilmington* as the place of his employment, and the residence of his friends. Not a single witness of the great number who have been examined in *Connecticut* and *Delaware*, ever heard a word escape his lips of his intention to return; or that *Wilmington* was only the place of his temporary residence. *Thomas Guier* entered the world as an

CASES IN THE SUPREME COURT

1808.     veyors who performed the duty, put the line of *Coates's* street
GODSHALL  in this place about two feet six inches southward of the accus-
   v.     tomed line. In consequence of this the defendant could not
MARIAM.   have his complement of ground without interfering with the
          regulation of the plaintiff's lot; and he therefore moved the
          fence. There was also some evidence that the regulators them-
          selves had since questioned their own regulation of *Godshall's*
          lot, as being founded on a mistake of the street line; and that
          there was *more* ground to the southward of the plaintiff, than
          was necessary to satisfy all claims.

          Upon these facts it was argued for the plaintiff, that the walls
          of his house, and the *lines of his lot*, were conclusively fixed by
          the regulation, and that the survey of *Coates's* street not being

adventurer, and in a few years acquired a good deal of property. It is there-
fore reasonable to believe he felt the full force of this irresistible cement to
locality and situation. This consideration founded on *interest*, furnishes the
strongest proof that he had fixed on *Wilmington* as the place of his domicil. A
remark of the unerring observer of human nature, that " where the treasure
" is the heart will be also," may be here applied with strict propriety.

Several witnesses say they believe he had fixed his residence at *Wilming-
ton;* others say they believe he had not fixed it there. This appears to be
mere opinion. Not a word from *Guier* himself has been given in evidence;
but his *silence* on the subject is an argument to shew his views were perma-
nently fixed on that country, in which his affairs wore the most promising
aspect. When he proposed to settle his affairs, he does not think of *Connec-
ticut*, but of sending to Judge *Booth* at *New-Castle*, to draw his will in favour
of that part of his family who were resident there.

It is I think extremely doubtful whether voting and paying taxes are in
any case necessary to constitute a domicil, which being a question of general
law, cannot depend on the municipal regulations of any state or nation. Vo-
ting is confined to a few countries, and taxes may not always be demanded.
*Guier* was a seafaring man; and one of the witnesses says that between the
14th *January* 1800 and the 15th *October* 1801, he sailed six or seven times.
Is it any wonder a single man thus engaged in trade should escape taxation?
It frequently happens that young men who never go abroad, are not disco-
vered to be objects of taxation till they have reached the age of five or six
and twenty. If *Guier* escaped taxation through the neglect of the officers of
government, it is impossible to conceive how their neglect can have any
effect on the question of domicil. The almost constant absence of a sailor
from home, actually effaces from his mind voting at elections; yet it appears
*Guier* was present at *one* election and offered his ticket, which, though not
received, is a striking fact to shew he considered himself in the light of a
citizen. The ticket not being received does not alter the nature of the trans-
action on the part of *Guier;* the evidence resulting from it, of intention to
settle and reside, is the same as if it had been actually received.

completed until after the regulation, could make no impression on the cause: but that at all events, that survey did not, and was not intended to, ascertain where the true line of *Coates's* street was, but to fix a line for its future course. That therefore, for any thing that appeared, the regulation was right. For the defendant it was said, that the regulation, so far as it respected the unbuilt part of the lot, was not conclusive, and that as the plaintiff's lot was bounded by a thirty five feet *corner* lot, the whole question was, where the corner of *Coates's* street was, which the survey conclusively shewed. The Chief Justice charged the jury that there could be no doubt that the walls of the plaintiff's house were fixed irrevocably in 1798, by a regulation from which there was no appeal, but he would reserve the question *whether the lines of the lot were also fixed.* That the jury might then consider them as not fixed; and if so, he thought the survey was strong evidence to shew where the line

As to his sailing *one* voyage from *Philadelphia,* at which time it is probable he obtained a certificate of his being a native of *Connecticut* and a citizen of the *United States,* they appear to be accidental circumstances, such as may be looked for in the life of a sailor, and no wise incompatible with his residence in another place.

Employments of the most opposite character and description may have the same effect to produce a domicil. A man may be alike domiciled, whether he supports himself by ploughing the fields of his farm, or the waters of the ocean. It is not exclusively by any particular act that a domicil, generally speaking, is acquired; but by a *train of conduct* manifesting that the country in which he died was the place of his choice, and to all appearance, of his intended residence. The sailor who spends whole years in combating the winds and waves, and the contented husbandman whose devious steps seldom pass the limits of his farm, may in their different walks of life, exhibit equal evidence of being domiciled in a country. Every circumstance in the conduct of old *Guier* and his son *Thomas,* taking into view the unsettled mode of life of the latter, affords the fullest proof that they were both domiciled in *Delaware.* If the proof be stronger in either case, it is in the case of *Thomas,* who, though employed in traversing the globe from clime to clime, constantly returned to *Wilmington,* the source and centre of his business, the seat and abode of his friends and connexions. His "heart " untravelled" appears to have been immoveably fixed on the spot, to which he was attached by the powerful tie of interest, and the strongest obligations of social duty; and never for a moment to have pointed a wish to any other country.

We are of opinion *Thomas Guier* was domiciled in the state of *Delaware,* during pupillage; and that he was also domiciled there after he became *sui juris;* and do decree that his personal property *be distributed according to the laws of* THE STATE OF DELAWARE.