Bland, Chancellor.
It is clear, that in all ordinary cases, arising wholly within the jurisdiction of Maryland, this court, when it may be proper for it to act at all, may make an appointment of a guardian to an infant upon petition only, without any bill filed or suit in court; (a) and therefore, if this be a case in which it may act with propriety, there can be no doubt, *490 that it may, upon this petition alone, make such an appointment as is called for, without a suit. But it would be idle to act at all, if it should clearly appear, that the action of the Chancellor could be of no avail; and therefore, it will be proper to consider the nature of the Chancellor’s authority in relation to the guardianship of infants; and the principles of international courtesy upon which an appointment of a guardian to an infant made in one nation, may be recognized in all others.
This petition asks for the appointment of a guardian to eight infants, of different ages and sexes; and consequently, it may be well, before we proceed with the principal matter, to make some observations as to the nature of that incapacity, for which it is here proposed to provide by the appointment of a guardian.
There are two kinds of personal incapacity; the one natural, the other artificial; or first, that which arises from bodily or mental defect; and secondly, that which is declared by positive law. Of the first kind, is that of lunacy. A lunatic is every where held to be incompetent to contract in any way whatever, by reason of his mental defect; (b) and because of incurable impotence, arising from injury, or malconformation, a person is every where held to be incompetent to contract marriage; which requires a bodily as well as a mental ability so to contract, (c) Of the second kind of personal incapacity, is that of a married woman; whose incapacity, (regarding the mere bond by which the parties are bound together as husband and wife, as that alone which is recognized by the law *491 of nations as being every where alike obligatory,) is in each state of positive institution; and varies in form and degree with the various nations by whose laws it is regulated; or within which country, she, with her husband, may, for the time being, have their domicil. (d) The incapacity of an infant, is, in some respects, both natural and artificial. For some time after birth, the incapacity of an infant, both bodily and mental, being natural and alike in all countries, must accordingly be every where so considered. Yet after that period of mere infantine imbecility, there is a space of non-age established by law, which is different in different countries.
But as the exact point of full age has been every where regulated, chiefly with a view to the disposition of property, what is to be deemed full age, must therefore be determined, in each state, according to that right of disposition. Claims to land and immoveable property are always regulated by the law of the place where it is situated; and henee, although these female infants would here, on their attaining the age of eighteen, have a right to dispose by will, of their real estate here; (e) yet, they may not be allowed to make any such disposition of their land in Trinidad, until they attain the age of twenty-one years. And as the disposition of personal property is, with some qualifications, allowed by all nations to be governed by the law of the owner’s domicil, it follows, that full age, as established by that law, must give a capacity to dispose of such properly, wherever it may be found. Except however, that every person, whether temporarily or permanently living in a country, must, as to all his personal capacities, during his residence there, be governed by the law of the place; as, in general the personal capacity is regulated by the law of the country, (f) And consequently, in the case under consideration, no great difficulty can arise in fixing the exact termination of the infancy of these children, or the duration of the guardianship, that may be here assumed over them.
Among the important duties which a state owes to itself, is wrapped up, that obligation by which it is bound to take care of all *492 its own citizens. Upon which obligation each member of the community, as a component part of the whole, has a clear and unde-, niable claim upon the state for its assistance, in all cases, where, either because of the over-ruling circumstances in which he may be placed, or because of his own peculiar imbecility, he is incapable of sustaining himself. Hence it is, that, according to .all law, a state is bound to take care of and protect its own infants, lunatics, and paupers, (g) And such has always, been the practice, and the admitted obligation and.law of Maryland.
In England, many doubts and much contrariety of opinion have been expressed as to the sources from which the Chancellor derives the power he exercises in cases of infancy and lunacy. It is admitted, on all hands, that the state is under an ^obligation to put forth its power for the protection of such persons in some way, the only difference of opinion there, being as to the extent to which that power, looking to the manner in which it has been delegated to the Chancellor, shall be exercised by him for the benefit of those who may be found in that imbecile condition. (h) The Chancellor, or any court of common law may, by means of a habeas corpus, relieve an infa'nt or lunatic as well as an adult of sound mind from any illegal restraint, or set him free, without making any provision whatever for him, under that form of proceeding. But the general care which he has a right to claim, as a due from the state, can only be obtained from the Chancellor upon the ground of that parental authority with which he has been clothed as the representative of the state for the benefit of all such persons, (i)
Here it has always been admitted, apparently without any reference to the sources from which the Chancellor of England had derived his authority, that the Chancellor of Maryland was invested with all the powers in relation to infants and lunatics, with which the Ghancellor of England had been clothed; as founded on an obvious necessity, that the law should place somewhere the care of individuals who could not take care of themselves, particularly in cases where it was clear, that some care should be thrown around them. And consequently, the broad principle may be safely as- *493 Burned here, that the Chancellor is that judicial officer by whom the state discharges its duties in the care of its infants and lunatics in all cases where the care of them has not been otherwise specially and expressly provided for; (j) as by the jurisdiction conferred on the Orphans Courts; (k) or upon the trustees of the poor; (l) or by the establishment of alms houses, (m) hospitals, (n) and the like.
Upon the same general and fundamental principles of a duty to itself, the state is bound to protect the property as well as the persons of all who abide, or suffer their property to remain within its domain. An alien friend may purchase and hold chattels, real, and all kinds of personal property; and may freely transfer to any place, beyond the jurisdiction of the state, his moveables, subject however in general to such export duty as the state may think proper to impose; and also subject, in cases of public expediency, or on his becoming an alien enemy, to a total prohibition of removing any of his property out of the state, so as thereby to weaken it and strengthen its antagonist. This permission of removal of personal property is, however, granted with a view to the encouragement of commerce and the aggrandizement of the state; and therefore, the exceptions to the rule, as well as the rule itself, are deprived from the same source, that of a duty which the state owes to itself, as a whole; and as one which it owes to each of its citizens in the protection of his interests by the general operation of its laws. The free exportation of moveables, which, in almost all nations, has been treated as a kind of general licence, which may be withheld altogether, or subjected to the control of a heavy tax, may, in the United States, in time of peace, be considered as an almost unqualified right, since the federal constitution has declared, that no tax or duty shall be laid on articles exported from any state, (o) But this constitutional restriction relates to commercial regulations only, and to taxes which might have been so imposed for the purpose of raising revenue for the benefit of the whole state. It cannot affect the right to detain and prevent the exportation of any such property for the special benefit of any citizen of the state, and as a means of enabling him to obtain satisfaction of a debt *494 due to him from its owner. And therefore, even although the exportation of such property may be regarded here as an absolute right, yet the authority of a citizen creditor to seize it by a judicial proceeding, and have its exportation totally prevented by a sale for the satisfaction of his claim, is no more than the exercise of an authority for his benefit which the state owes him as a duty. Hence it is, that by our attachment act and practice, and by some similar judicial proceeding in all other countries, a citizen creditor may obtain satisfaction of his claim from the property of his foreign or absent debtor found within the jurisdiction of the state. (p)
The state would, however, fall short in this its duty, if it failed to provide some means of securing satisfaction to its own citizens as well from the property found here of their foreign insolvent or deceased debtors, as from their foreign and solvent living debtors. That provision of the federal constitution, which declares that the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states; (q) looks to other privileges, such as the right to acquire and hold property, to take by descent, and the like, and does not at all affect the duty which, in this respect, each of the several states of our Union owes to its own citizens ; (r) or that course of distribution consequent upon intestacy., which, by the general comity prevailing among nations, is regulated according to the testator’s domicil, (s) The law of nations, so far as it applies to the regulations of commerce, is, as in all other respects, founded on principles of perfect reciprocity and equality; and, therefore, it cannot be applied to cases which do not admit of reciprocation and equality. In England, and in some' other countries, there are bankrupt laws; in this there are none. Under the insolvent laws of some of the states of our Union, the person of the debtor may be released from confinement, leaving all his then held, or thereafter acquired property liable; but, under our law, a debtor may be so absolutely discharged as to protect his future acquisitions of property as well as his person. And, besides, bankrupt and insolvent laws are not so much regulations of com *495 merce, as they ate mere municipal rules of law for winding up and. adjusting cases of interrupted and broken commerce; they are forced upon debtors, without any alternative, as the only means of escaping imprisonment, and are highly penal in many of their provisions; they cannot, therefore, be considered as in all respects voluntary, and must be, from their very nature, entirely local in their operation.
Hence, it has always been held here, that the bankrupt and insolvent laws of the other states of our Union, as well as of other countries, could not be allowed to operate, in any way whatever, upon the property of the debtor found here, and particularly in contravention of any rule in relation to immoveable property lying within this state, or to the prejudice of any citizen of this state; as they clearly would, if they were allowed to vest any right in the assignees or trustees of such bankrupt or insolvent debtors, or were permitted to give an exclusive right to have such property removed any where beyond the jurisdiction of the state, there to be distributed among all his creditors, including those resident here, which would be, in effect, to restrain our own citizen creditors from touching their absent insolvent debtor's property found here, upon which he had been credited, and to direct them to follow it into a distant and foreign country, there to seek satisfaction according to laws with which, it could not be presumed, they were at all acquainted. (t)
Therefore, in discharge of this duty to its own citizens, Maryland, by one of its earliest legislative enactments, not now in force, declared, that where the goods of a debtor sued were not sufficient to pay all his debts within the province, they should be sold at an outcry, and distributed equally among all the creditors inhabiting within the province, except that the mere and proper debts of the Lord Proprietary should be first satisfied, and then fees and duties to public officers, and charges; and that debts due for wine and hot-waters be not satisfied till all other debts were paid, (u) and by other and still existing acts of assembly, it has provided, that all citizen or country creditors, as they were called, should have made or secured to them a full satisfaction of their claims out of their foreign bankrupt or insolvent debtor’s property found here, before it should be removed beyond the jurisdiction of the state. (w)
*496 These, and similar legislative enactments passed by the other colonies, now states of our Union, were, before the revolution, much complained of by the mother country, as bearing hardly and unjustly upon the interests of creditors resident in Great Britain, (x) Indeed, England having a greatly extended commerce, and her merchants and manufacturers crediting abroad vastly more than they owe to foreign creditors, has a strong and peculiar interest in contending for a rule which draws to herself the distribution of all the effects which her lucrative commerce has dispersed over the globe; (y) and hence, it has long since become the settled policy of the Englis` judiciary, to extend the operation of their bankrupt laws, so as to grasp and gather under their administration, for the benefit of English creditors, the effects of those who may be declared bankrupt under their laws, from all parts of the world, regardless of the pernicious bearing of such a proceeding upon the interests of the foreign creditors of such bankrupt or insolvent debtors; upon the ground, that personal property must be governed by the law of the owner’s domicil, (z) And yet it is held by them, that the discharge of a debtor, under the bankrupt or insolvent laws of one country, cannot impair the obligation of contracts made in another, or discharge such debtor from any liability to the claims of his foreign creditors contracted any where else, (a)
But the weight of American judicial authority, is adverse to such an unfair course of proceeding, and accords in principle with the before mentioned legislative enactments of Maryland, by which the interests of the state’s own citizens are to be first and specially regarded; and for that purpose, our law refuses to allow the *497 proceedings under the bankrupt or insolvent laws of a foreign state, to give any right, or to affect the title to any property-belonging to the debtor, and found within this state, in any way whatever, (b)
The law in relation to the administration of a deceased foreign debtor’s effects found here, is now settled upon the same general principles, that of a duty which the state owes to its own citizens.
According to the ancient common law of England, upon the death of any one intestate his personal estate devolved upon the king, whose duty it was, as sovereign, and as parens patries, to take care of, and have justice done to all his subjects; and therefore, he caused the effects of the deceased to be placed in the hands of some fit person, to be administered for the benefit of his creditors and next of kin. After which, this public duty of the sovereign was delegated by him to the clergy; who under the pretext of applying such estates to pious uses, upon the ground, that there was a general principle of piety in the testator, (c) fraudulently appropriated the whole to their own aggrandizement, leaving the creditors of the deceased unpaid, and his next of kin destitute. To prevent these fraudulent practices of the clergy of those times, the parliament interposed and passed laws, in affirmance of the ancient common law, requiring the bishops to appoint administrators, in whose hands the personal estate of intestates, should be placed, to be administered for the benefit of his creditors and next of kin. (d) But the bishops who had been so long in the habit of appropriating all the goods of intestates, found within their respective districts, to their own uses, were permitted to retain the right of granting administration of all such effects; and, therefore, to secure to themselves their fees and perquisites for so doing, they refused to admit the validity of an administration granted any where beyond their own peculiar jurisdiction, (e) And following out the same rule, the courts of law and equity of England, held •that they could not take notice of any letters of administration granted in a foreign country, without intimating, that they refused *498 to do so, in order to hold the property of the intestate within reach, as a means of satisfying his English creditors and next of kin; or if there were no creditors, or next of kin, as a means of securing it for the benefit of the state to whom, in such case, it properly belonged, (f)
But latterly, in England as well as in this country, a more enlarged and just view has been taken of this matter; and it has been held, that as the state must have a right to regulate that which it protects, and is bound in duty to see its own citizens satisfied before it suffers the property of their debtor to be withdrawn from its jurisdiction, no foreign administration shall be recognized here. And that the administration of all deceased persons’ estates must be taken out here by a citizen of the United States, (g) in order that there may be some person here responsible to our own citizen creditors, legatees, and distributees of the deceased, to the full value of his effects found here; and also, that after the debts have been paid, if there be no next of kin, that the surplus be paid to the state, or to the public schools here, to whom, in such cases, it properly belongs; or according to the law of' the deceased’s last domicil. (h)
It having been universally admitted, not indeed as a binding rule of international law, but as a matter of general comity among civilized nations, that personal property follows the domicil of its owner; and that the succession to it must be regulated, on his death intestate, by the law of that domicil; and as the administration of such property looks, in the first place, to the payment of all the debts of the deceased, and then to a distribution among those entitled to succeed to it, according to the law of the deceased’s domicil, it most commonly happens, that none but an administration under that law can, with facility, if at all, embrace both those objects. Consequently, the administration of the deceased’s domicil is, every where, regarded as the administration in *499 chief, while those granted in other countries of the effects of the deceased found there, are considered as merely auxiliary to such administration in chief. So that, for the benefit of creditors, and the public, the law of the state where the personal property is found gives the rule; although as regards a distribution among the next of kin of the deceased, the law of his domicil is allowed to govern, (i)
This reference to the last actual domicil of the deceased for the rules by which his personal estate is to be disposed of, is, however, most commonly made in cases of absolute intestacy; and so too in cases where the deceased may have made a will disposing of his moveables, it is always presumed to refer to the law of his then domicil; and upon that presumption, without any thing appearing to the contrary, it is deemed valid, or otherwise according to that law, and in pursuance thereof is executed, or set aside; recollecting, however, that no testamentary act or disposition can be allowed to contravene any known rule of our own law. (j)
But it must be always borne in mind, that according to all law, real estate, immovables, or territorial property, considered as a part of the habitation of the nation is, in all cases, governed entirely, and in all respects, by the law of the state under whose jurisdiction it is situated. (k) And moreover, that marriage, being a contract recognized by the law of nations, is, with few exceptions, valid every where if binding where it was made. (l) And consequently, that all the property of the wife vests in the husband, or becomes subject to his control during, and in consequence of the *500 marriage, or remains Subject to be disposed of by ber last will, or otherwise, as regulated by the law of their domicil, as selected by him, (m) and subject to the claims of his and her creditors accordingly. (n) As where the husband is allowed, by the law of their domicil, to sue for and recover his wife’s personal estate in equity, without making any settlement upon her, on the ground of what is here called ‘the wife’s equity,’ the sum claimed and due in her right, will accordingly be ordered to be paid to him without his making any such settlement upon her. (o)
Upon the ground of this duty which the state owes to its citizens, the general assembly of Maryland have, by sundry legislative enactments, provided, that where an infant, who has no natural or testamentary guardian, may be entitled to real estate by descent or devise, or to personal property by bequest, or in a course of distribution, or may have acquired any property by gift or purchase, the Orphans Court of the county where the land lies, or in which administration of the personal estate is granted, shall have power to appoint a guardian to such infant until the age of twenty-one years, if a male, and until the age of eighteen, if a female, or marriage; and that such guardian shall be charged with the care, maintenance and education of such infant, and with the management of his or her estate, (p) Declaring, however, in connection with those general provisions, that nothing therein contained should be construed to aifect the general superintending power exercised by the Court of Chancery with respect to trust. (q)
Now, on recollecting what has been before said as to the jurisdiction of the Court of Chancery, as the representative of the state, in its duty to infants as parens patries; and that by an English statute, passed in the year 1660, and adopted here, fathers have been authorized to appoint guardians to their legitimate infant children, (r) it clearly appears, that the ordinary tribunals, whose jurisdiction has b'een thus defined, cannot appoint a guardian to any infant whose father or mother is alive; or who has a testamen *501 tary guardian; or who has no property any where; or whose land does not lie within the body of any county of this state; or upon whose personal estate no administration can be granted by any Orphans Court of this state; and recollecting, moreover, that all guardians are considered as trustees, and as such, responsible in chancery, whose jurisdiction, in that respect, has been expressly saved, it will be seen, that the Chancellor has a large scope of jurisdiction lying entirely beyond that of the ordinary tribunals, in addition to that wide space of authority, founded on the doctrine of trusts, which may, as in calling guardians to account, and the like, be exercised in concurrence with those tribunals. (s)
It has been declared that every female orphan shall be accounted of full age to receive her estate at the age of eighteen years, or day of marriage, which shall first happen; (t) and such female infants have been endowed with a capacity, after that age, to execute a release to their guardians on receiving it; (u) and also with a ca *502 pacity then to make a will disposing of their real estates, (x) Yet,, as it has been held that such females cannot be deemed of full age for any other purpose, or in any other respect, (y) it would seem necessarily to follow, that female orphans between the ages of eighteen and twenty-one years, who have no testamentary guardian, being a class of infants for whom a guardian cannot be appointed by the Orphans Court, (z) guardians can only be provided for them by the. Chancellor. It is admitted, on all hands, that the father is the natural guardian of all his legitimate children until they attain twenty-one years of age, or until the females attain,that age or marry. But it seems to be doubtful whether the guardianship of a mother over her children continues longer than the age of fourteen; (a) if not, then it would seem, according to a fair construction of the before-mentioned legislative enactments, so far as the courts of ordinary jurisdiction may be permitted to assume any constructive power under them, (b) that a guardian may he appointed by them during the residue of such infancy. But in such case, and in all others, where the ordinary tribunals have no power to make an appointment; as in case of the lunacy or incompetency of a natural or testamentary guardian; (c) or where, because of the limited jurisdiction of those tribunals, they are incompetent to grant relief suited to the peculiar nature or exigency of the case, the general jurisdiction and power of the Chancellor, which has been in no way abolished or diminished, maybe resorted to and applied with effect, (d)
The proper education, of youth has, every where, and at all times, been held to be a matter of great and important interest to the state, (e) In England there has always been a religion, or church, by law established, which, by considering the clergy as one of the three estates of the.realm, has been interwoven with the-fundamental law and constitution of the nation. The regulation of schools has, therefore, in England, to a certain extent, been *503 subjected to that ecclesiastical establishment, (f) And consequently the authority of the English Chancellor to interfere with, and direct the religious education of infants, so far at least as to prevent them from being brought up in the belief of any religious creed, in direct and open violation of that of the established church, is founded upon this fundamental law and on that obligation by which all judicial officers are bound to support the constitution of their country, (g) Before the revolution, a religious creed having been established by law here, a similar obligation was imposed upon the courts of justice here, to take care of what was then deemed the proper religious education of infants in Maryland. (h)
It has, however, been declared, by the constitution of this republic, ‘ that, as it is the duty of every man to worship God in such manner as he thinks most acceptable to him, all persons professing the Christian religion are equally entitled to protection in their religious liberty,’ &c.; (i) and also, ‘ that the liberty of the press ought to be inviolably preserved.’ (j) And it having also been declared, by the constitution of the United States, that ‘congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press.’ (k) It follows, that none of the public functionaries of this state, or of the Union, can exercise any authority at variance with those great rules of fundamental law by which the freedom of religious and political opinions are secured to our citizens. Consistently, however, with those constitutional provisions, it may, nevertheless, be held to be within the scope of the Chancellor’s jurisdiction in the case of infants, to have them removed from under any open or direct immoral and vicious influence or example; as from the tuition of an infamous convict; (l) where the infant could not fail to be engaged in vicious pursuits, or be prevented from acquiring those virtuous principles and habits indispensable to the formation of a good and useful citizen, (m)
*504 But, although the slate has thus, by its constitution, withheld from all who may be entrusted with public authority, all power over the religious or political opinions of its citizens, infant or adult; yet it has a large interest in having her infants educated under the influence of that very freedom which has been secured to them. And, therefore, the Chancellor here, as in England, looking to his constitutional duties, in this respect, would not suffer a guardian to send his ward abroad, or out of the United States to be educated, where principles adverse to our institutions must necessarily be inculcated, and might be too copiously imbibed. (n) And although parents of infants may well be indulged upon the ground of their own right to leave this country at pleasure, to take with them their infant children wherever they may go, (o) yet the court will not allow a father, under the colour of his parental authority, to work the ruin of his child, or suffer the child to be in any way sacrificed to his views; (p) nor will it concede to any mere legal guardian an unlimited power to dispose of his ward as he may think proper; since the state has a deep interest in retaining and educating her own infants, with a view to her own strength and improvement. (q) And as an infant cannot, of himself, acquire any domicil, but always retains that of his parents, or of his origin, so his having been left here as an orphan devolves upon the state a right to retain him within its jurisdiction for its own benefit, as well as for his own advantage. And therefore a guardian merely constituted such by law, is never permitted, at his pleasure, to change the domicil of his ward for any purpose, much less with a fraudulent intent to alter the rule of succession to his property from that by which it would have been governed according to the law of the domicil from which he was removed, (r)
According to the established principles of international law, no one nation ean, under any pretext, interfere with the internal regulations or domestic concerns of another; nor can any one nation be allowed to withdraw from another any of its citizens, to impair its strength, or to diminish its resources in any way whatever. Subject, however, to these fundamental axioms, individuals are per *505 mitted, in time of peace, freely to migrate from one nation to another, and to take with them their infant children and property, or to have their moveables transported any where; provided they do so fairly and without prejudice to the state, or to any one; as in the cases and upon the principles before explained. Whence, it is clear, that, under the law of nations, the free removal of persons and of property, from one state to another, can only be restrained, upon the ground of a duty of the state to itself, or to its own citizens; and that, apart from those restrictions, no infant or adult can be in any way hindered or embarrassed in withdrawing his property from any other state into that of which he is a resident citizen, or within which he has his domicil.
It is universally admitted, that immoveable property of all descriptions, must be regulated by the law of the state within which it is situated. But a foreigner, or a non-resident, who may be permitted to hold sueh property, must, as a necessary consequence of that permission, be allowed to collect and have remitted to him, its rents and profits. A living adult owner may, by a sufficiently authenticated power, cause the rents and profits of his real estate, or the whole of his personal estate to be transmitted to him any where beyond the jurisdiction of the state. And by a comity, now prevalent among all civilized nations, founded on this concession to living owners, qualified by a proper regard to itself and its citizens, an administration granted under the law of the deceased’s domicil, is so far recognized by every other nation as to be considered as the administration in chief, to which the administration taken out in the state where the property is found, is only auxiliary; and to which administration in chief, the surplus must be handed over for the purpose of distribution. And so too, marriage, if valid where solemnized, being recognized as valid every where, vests in the husband full authority to cause his wife’s personal property to be transferred to any place he may think proper.
An infant is incompetent, by reason of his infancy, to clothe any one wdth a power to dispose of his property; and yet his right to have it removed, during his infancy, is as perfect; and the benefit of removal may be, and often is, much greater to him than to an adult owner. Hence, it is laid dowrn, that it belongs to the domestic judge to appoint a guardian to an infant; and.that the law of nations, which has an eye to the common advantage and the harmony of states, requires the appointment of such a guardian to be recognized as valid in all other countries in which the infant *506 may have any concerns, (s) An administration granted abroad, and the assignees or trustees appointed under the bankrupt or insolvent laws of another state, are not allowed to have any authority here, in order that the interests of the state and of its citizens, may be protected. But no such reason can exist for refusing to recognize the appointment of a guardian of a foreign infant, made under the laws of the state to which he belongs. An infant being incompetent to contract, or to incur debts for any thing more than mere necessaries, the irresistible presumption is, that he can have no creditors beyond the immediate sphere of his domicil; and consequently, there can be no probability, that any of our citizens would be at all prejudiced by allowing to a foreign infant, by his foreign guardian, the same kind of right of removing his effects beyond the reach of our laws, which has been so freely conceded to a foreign adult.
But if it were held to be necessary to have the moveables belonging to a foreign infant, placed in the hands of a guardian appointed here, it would be in effect, to determine that his property should be withheld from him during the whole term of his infancy; or at least, that it should be exposed to the great risk and expense of a foreign management, where the extent of his wants could not be correctly estimated, and the seasonable application of the profits of his estate to his necessary calls could not be made. In short, the recognition of the appointment of a guardian to a foreign infant, under the law of his domicil, is a courtesy which may be safely and readily reciprocated among nations, without the slightest injury to any one, and with the greatest benefit to infant owners every where. Therefore, the reason, the justice, and the necessity of such cases, obviously require such a general and mutual recognition; and that the authority of such an agent should be every where regarded as having the same extent as the authority of an adult owner himself, in so far as it may be necessary to sue for, collect, and remove his personal estate, and the rents and profits of his lands, without contravening the law of the state where such land may be situated, as to the right and title to it. (t)
*507 It must be recollected, however, that although there is an obvious propriety in recognizing the appointment of a guardian so made, under the law of one state in every other state; yet, that when this court is called upon, in respect of any property found here, belonging to an infant foreigner, to appoint a guardian for him, for the purpose of having it taken care of, no one can be appointed who is not a resident within its jurisdiction, so as to be held responsible, and subject to its control; because no state can extend its process, or give efficacy to its judicial power, or its laws beyond its own jurisdiction, (u) And so too, where an infant has been improperly, or illegally removed into a foreign country, there, from necessity, the guardian here must be authorized to remit, or have applied, as well as circumstances will admit, the annual income of his estate for his maintenance and education. (w)
But it is believed, that there is no well considered English adjudication, by which it has been determined, in opposition to the rule laid down by the most eminent writers on public law, that the appointment of a guardian to a foreign infant, under the law of his domicil, must be recognized and allowed every where else.
In the case under consideration, this court is called upon to appoint a guardian to several male and female infants by their father and natural guardian; for whom, even if they had no natural guardian, it is at least questionable, whether any of the Orphans Courts could appoint a guardian; because, the lands of these infants do not lie any where within this state; and because no administration could be granted here of the personal property, lying within the British dominions, which has been bequeathed to them, by one who died abroad, who was not domiciled within this state, and who left no property here. Their case is, in these respects, peculiar. But being citizens of Maryland, it is the duty of this state to protect their interests ; and the discharge of that duty, by virtue of the general jurisdiction with which he has been clothed in such cases, devolves upon the Chancellor. According to the principles of equity by which this court is governed, where property has been in any way acquired by an infant, whose parents are living, it may, if necessary, provide for its preservation, either independently of such natural guardian, or by compelling him to give *508 security for its safety, (x) and in addition to this general authority of this court, it has been expressly declared, not only as formerly, tha.t a natural guardian may be called on by the Orphans Court to give bond for the performance of his trust , (y) but that every natural guardian, or guardians appointed by last will, shall give bond, with sureties to be approved by the Orphans Court, and shall be under the like regulations as are prescribed with respect to other guardians, (z)
Here it is not only necessary to provide for the safety of the property belonging to these citizen infants; but, as it is to be collected and brought here for their benefit, from abroad, it becomes necessary, for the purpose of facilitating its removal, to affirm the natural guardianship of their father by the high authority of this court; and thus have the legality of his power, authenticated under the great seal of the state, which, by the law of nations, is accredited every where; (a) so- that by virtue of such appointment, he may be enabled at onee, to' collect and bring into' this state, all their moveable effects, and to dispose of their immoveables in such manner as the law of the place may allow.
Decreed, that the petitioner, James Corrie, of the city of Baltimore, be, and he is hereby appointed guardian to each one, and to all of his said infant children, that is to' say, Frances Corrie, James Corrie, Margaret Corrie, Samuel Corrie, Theresa Corrie, William Corrie, Daniel Corrie, and Alexander Come;, with full power and authority as such, to ask, demand, sue for, collect and take possession of all debts, legacies, devises, rights, effects, and property of the said infants,: lying or being any where beyond the *509 jurisdiction of this state; and to give receipts and releases for the same; and to make sale or dispose of the same in any manner he may deem most advantageous for the said infants, so that the same, or the proceeds thereof, may be transferred to, and brought within the jurisdiction of this state, where the same may be taken care of, accounted for and distributed, according to law, among the said infants, or those to whom the same may respectively belong. And that the said James Corrie, before he acts as guardian, shall file with the register, a guardian’s bond, in the form prescribed by law, in the penalty of ten thousand dollars, with surety to be approved by the Chancellor.

 Eyre v. Shaftsbury, 2 P. Will. 118, 120; Ex parte Birchell, 3 Atk. 813; Ex parte Salter, 2 Dick. 769, S. C.; 3 Bro. C. C. 500; Ex parte Wheeler, 16 Ves. 266. In the matter of Woolscombe, 1 Mad. Rep. 213; O’Keeffe v. Casey, 1 Scho. and Lefr. 106; Villareal v. Mellish, 2 Swan. 536, note; Pratt v. Pratt, ante 429.
Ex parte Eoss. — Oliver Bond Eoss, by his father and next friend, James Eoss, filed his petition here, in which he stated, that his father had purchased for him tea shares of stock in the Union Bank of Maryland, for the paying of the instalments, drawing the dividends, &c. on which, it was necessary he should have a guardian appointed; and therefore prayed, that his father might be appointed his guardian, &c.
\Wi April, 1805. — Hanson, Chancellor. — The Chancellor has considered the petition of Oliver Bond Eoss, and is by no means satisfied that it is necessary, or that it will be deemed proper for him to exercise the power of appointing a guardian in the present case. Prom the 101st act of 1798, ch. 12, it clearly appears, the idea of the legislature, that a father is by nature, entitled to act as guardian of the property as well as the person of his child, unless, &c. &c. The Chancellor makes these remarks, in order that his decision may not be considered hereafter, as a precedent, respecting the right, or power of a natural guardian. And as it is impossible, that his appointment, concurring with the order or institution of nature, can be injurious; it is Decreed, that James Eoss, of Baltimore, father of the petitioner, be, and he is hereby constituted guardian of the said Oliver Bond Eoss, for the purpose only, of superintending and managing the shares and interest of the said Oliver B. Eoss, in the Union Bank of Maryland; and of paying the said bank or receiving from it, money for the said Oliver; and of acting in the premises, to all intents and purposes, as the said Oliver, if of full age, might act for himself. And it is hereby declared the intent of this decree, to give to the said James Eoss, authority to act as guardian in no other respect whatever.
*490 Some doubts having arisen, and objections having been made as to the extent of the authority of the guardian under this order, the matter was again brought before the court.
26th June, 1805. — Hanson, Chancellor. — The Chancellor having heretofore passed ¡an order, authorizing James Boss, the father of Oliver Bond Boss, to superintend and manage certain shares and interest of the said Oliver B. Boss, in the Union Bank of Maryland, and of paying the said bank, or receiving from it money for the said Oliver B. Boss; and of acting in the premises, to all intents and purposes, as the said Oliver, if of full age, might act for himself; and doubts being, as is stated, entertained as to the extent of the authority of the said James Boss; it is hereby adjudged and Ordered, that the said James Boss be, and he is hereby authorized to sell and transfer the said shares, or any of them, in the same manner, as if the said shares belonged to himself; and in all respects, relative to the said shares and interest, to act for the said Oliver Bond Boss, as the said Oliver, if of full age, might act for himself. (Such guardians now required to give security, &e. 1816, ch. 203, «• 10

 Ex parte Lewis, 1 Ves. 298; Ex parte Annandale, Amb. 80; Ex parte Gillam, 2 Ves. jun., 587.

 Sabell’s case, Dyer, 179; Bury’s case, 5 Co., 99; Guest v. Shipley, 4 Eccles. Rep. 548.

 Feaubert v. Trust, Prec. Cha. 207; Doe v. Vardill, 11 Com. Law Rep. 266.

 1798, ch. 101, sub ch. 1, s. 3.

 Ex parte Gillam, 2 Ves. jun., 587. In the matter of Houston, 1 Russ. 312; Male v. Roberts, 3 Esp. N. P. Rep. 163 ; Dalrymple v. Dalrymple, 4 Ecclesi. Rep. 485; Herbert v. Herbert, 4 Eclesi. Rep. 535; Ruding v. Smith, 4 Ecclesi. Rep. 551; Harford v. Morris, 4 Ecclesi. Rep. 575; Middleton v. Janverin, 4 Ecclesi. Rep. 582; Doe v. Vardell, 11 Com. Law Rep. 266.

 Eyrie v. Shaftsbury, 2 P. Will. 118, 123; Vattel, b. 1, ch. 2; Montesq. Sp. Law, b. 23, ch. 29.

 Co. Litt. 89, a. note 16; 2 Fonb. 226; 1 Blac. Com. 302, 304, 460; De Manneville v. De Manneville, 10 Ves. 63.

 De Manneville v. De Manneville, 10 Ves. 58; Lyons v. Blenkin, 4 Cond. Cha. Rep. 115, and notes ; The King v. Hopkins, 7 East. 579; The Case of the Hottentot Venus, 13 East. 195 ; Ex parte Skinner, 17 Com. Law Rep. 122.

 Wellesley v. Beaufort, 3 Cond. Cha. Rep. 10; Ex parte Francis Lee, a lunatic, 7 June, 1718; Chancery Proceedings, lib. P. L. fol. 469.

 1798, ch. 101, sub ch. 12; Bac. Abr. tit. Customs of London, B.

 1793, ch. 45; Lunatic Petitions, 2 Atk. 52; 1 Collin. Idiots, 604.

 1768, ch. 29, &c,

 1797, ch. 102,. &c.

 Const. U. S. art. 1, s. 9, cl. 5.

 1715, ch. 40 ; 1795, ch. 56; 1825, ch. 114; Burk v. McClain, 1 H. & McH. 236; Shivers v. Wilson, 5 H. &. J. 130; Barney v. Patterson, 6 H. & J. 182; Willes v. Pearce, 6 H. & J. 191, note; Mandeville v. Jarrett, 6 H. & J. 497; Taylor v. Phelps, 1 H. & G. 493; Manro v. Almeida, 10 Wheat. 473; Douglas v. Forrest, 15 Com. Law Rep. 120; Chase v. Manhardt, 1 Bland, 344

 Art. 4, s; 2, cl. 1.

 Campbell v. Morris, 3 H. & McH. 535; Ward v. Morris, 4 H. & McH. 340.

 Thorne v. Watkins, 2 Ves. 36; 5 Ann. ch. 8, art. 4.

 Holmes v. Remsen, 20 John. Rep. 229.

 1638, ch. 2, s. 11; 2 Boz. His. Mary. 147.

 1704, ch. 29; 1753, ch. 36; 1786, ch. 49, s. 3 ; Burk v. McClain, 1 H. 8 McH. 236; Ward v. Morris, 4 H. & McH. 337.

 Ex parte Blakes, 1 Cox, 398; Hunter v. Potts, 4 T. R. 187; Chalmer’s Political Annals, 689, 693; 1 Chal. Opin. Em. Lawyers, 29. In an opinion of the attorney and solicitor-general, D. Ryder and W. Murray, given on the 3d of June, 1747, to the commissioners of trade and plantations, respecting an act which had been passed in the year 1715, by the general assembly of North Carolina, for giving priority to country debts, they say, ‘that such part of the act as postpones the execution on judgments for foreign debts, in the manner therein provided, is contrary to reason, inconsistent with the laws, and greatly prejudicial to the interests of this kingdom ; and therefore, unwarranted by the charter; and consequently, void. And we are of opinion, that his majesty may declare the same to be so, and his royal dis-allowance thereof.’ 2 Chal. Opin. Em. Lawyers, 62.

 Holmes v. Remsen, 20 John. Rep. 264.

 Sill v. Worswick, 1 H. Black. 665 ; Philips v. Hunter, 2 H. Blac. 402; Hunter v. Potts, 4 T. R. 183.

 Smith v. Buchanan, 1 East. 6; Lewis v. Owen, 6 Com. Law Rep. 555; Phillips v. Allen, 15 Com. Law Rep. 269; M’Kim v. Marshall, 1 H. & J. 101; Frey v. Kirk, 4 G. & J. 510.

 Holmes v. Remsen, 20 John. Rep. 229; Milne v. Moreton, 6 Binney, 353 ; Burk v. McClain, 1 H. & McH. 236; Wallace v. Patterson, 2 H. & McH. 463; Harrison v. Sterry, 5 Cran. 289; Ogden v. Saunders, 12 Wheat. 213; Brickwood v. Miller, 3 Meric. 280; Kames’ Pri. Eq. b. 3, c. 8, s. 6.

 Moggridge v. Thackwell, 7 Ves. 69.

 Hensloe’s case, 9 Co. 37; Carter v. Crawley, T. Raym. 496; Marriot v. Marriot, Gilb. Eq. Rep. 203 ; Manning v. Napp, 1 Salk. 37; 2 Inst. 397; 2 Blac. Com. 494; 13 Ed. 1 c. 19; Kilty Rep. 144. —

—Middleton v. Crofts, 2 Atk. 659; Roberson Succession, 250, 251.

 Daniel v. Luker, Dyer, 305; Jauncey v. Sealey, 1 Vern. 397; Tourton v. Flower, 3 P. Will. 370; Atkins v. Smith, 2 Atk. 63; Thorne v. Watkins, 2 Ves. 36.

 1798, ch. 101, sub ch. 4 and 5.

 Bempde v. Johnstone, 3 Ves. 198; Somerville v. Lord Somerville, 5 Ves. 750; In the Goods of Beggia, 2 Eccle. Rep. 126; Holmes v. Remsen, 20 John. Rep. 265; Grœme v. Harris, 1 Dall. 456; McCullough v. Young, 1 Bin. 63 ; Desesbats v. Berquier, 1 Bin. 336, 349, note; Anonymous, 1 Hayw. 355; Admr, of Butts v. Price, 1 Cam. & Norw. 68; Harrison v. Sterry, 5 Cran. 289; Smith v. The Union Bank of Georgetown; 5 Peters, 518; Glenn v. Smith, 2 G. & J. 493; Charlotte Hall School v. Greenwell, 4 G. & J. 408; Thomas v. Visitors of Frederick County School, 7 G. & J. 370.

 Pipon v. Pipon, Amb. 26; Thorne v. Watkins, 2 Ves. 36; Somerville v. Lord Somerville, 5 Ves. 750; Potinger v. Wightman, 3 Meriv. 68; Lowe v. Farlie, 2 Mad. Rep. 101; Munroe v. Douglas, 5 Mad. 380; Logan v. Fairlie, 1 Cond. Cha. Rep. 459; The Harmony, 2 Rob. Adm. Rep. 322; La Virginie, 5 Rob. Adm. Rep. 98; Smith v. The Union Bank of Georgetown, 5 Peters, 518; De Sobry v. De Laistre, 2 H. & J. 224.

 Wallis v. Brightwell, 2 P. Will. 88; Brodie v. Barry, 2 Ves. & Bea. 130; Anstruther v. Chalmer, 2 Cond. Cha. Rep. 285; Curling v. Thornton, 2 Eccle. Rep. 197; Larpent v. Lindry, 3 Eccle. Rep. 166 ; In the Goods of Reid, 3 Eccle. Rep. 207; In the Goods of Maraver, 3 Eccle. Rep. 218; Armstrongs. Lear, 12 Wheat. 169; Desesbats v. Berquier, 1 Bin. 336; Burnley v. Duke, 1 Rand. 108 ; De Sobry v. De Laistre, 2 H. & J. 195; Vattel, b. 2, ch. 8, s. 111.

 Roberdeau v. Rous, 1 Atk. 544; Brodie v. Barry, 2 Ves. & Bea. 131; Elliott v. Lord Minto, 6 Mad. 16 ; The United States v. Crosby, 7 Cran. 115; Kerr v. Moon, 9 Wheat. 565; Binney’s Case, ante 145.

 Roach v. Garvan, 1 Ves. 158; The King v. Brampton, 10 East. 282; Lautour v. Teesdale, 4 Com. Law Rep. 299; Ruding v. Smith, 4 Eccle. Rep, 551; Scrimshire v. Scrimshire, 4 Eccle. Rep. 562; Harford v. Morris, 4 Eccle. Rep. 575; Middleton v. Janverin, 4 Eccle. Rep. 582.

 Lashley v. Hog, Robbins’ Succession, 430.

 Feaubert v. Turst, Prec. Cha. 207; The Goods of Maraver, 3 Eccle. Rep. 218.

 Minet v. Hyde, 2 Bro. C. C. 663 ; Bourdillon v. Adair, 3 Bro. C. C. 237; Campbell v. French, 3 Ves. 321; Sawer v. Shute, 1 Ansfr. 63; Dues v. Smith, 4 Cond. Cha. Rep. 257. —

 1715, ch. 39, s. 13 and 15; 1798, ch. 101, sub ch. 12; 1807, ch. 136, s. 4; 1829, ch. 216, s. 5 ; 1831, ch. 305, s. 5 and ch. 315, s. 8, 9 and 11.

 1798, ch. 101, sub ch. 12, s. 16; 1831, ch. 315, s. 17

 12 Car. 2, c. 24; Kilty Rep. 238; 1798, ch. 101, sub ch, 12; Villareal v. Mellish, 2 Swan. 536, note.

 Hepburn v. Hepburn. — This bill was filed by John Hepburn, an infant, by Henrietta Maria Walker, his mother and next friend, against Samuel Chew Hepburn, his guardian, for an account, &c. The defendant answered, and the case was brought before the court.
16th April, 1791. — Hanson, Chancellor. — The Chancellor is of opinion, that this court hath an undoubted authority to interpose in the affairs of all infants under the care of guardians, on the application of their nearest friends. As it appears, both from the bill and answer, that at least the education of the complainant hath been neglected; and that there does not exist, between him and the defendant, such a confidence and good will as ought to prevail between persons connected by a twofold endearing relation; as the defendant admits a balance in his hands, belonging to the complainant, under the last will of his father John Hepburn, jun., to a considerable amount in current money and tobacco; as the complainant, on attaining full age, will be entitled to a considerable estate, both real and personal; as the Chancellor conceives it proper for the complainant to be educated and maintained according to his rank; as it is even most eligible for the defendant to dispose of the said balance under the direction of this court; and as the defendant has expressed a willingness to be directed in that respect by this court:
It is Adjudged and Ordered, that the defendant deliver unto Henrietta M. Walker, the complainant’s mother, on or before the first day of June next, the sum of £35 current money, and the like sum of £35, quarterly, until the complainant shall attain his full age of twenty-one years; and that the receipt of the said Walker shall be good against the complainant. And it is further Adjudged and Ordered, that the said Henrietta M. Walker, provided she accept the trust in her hereby reposed, shall apply the said money to the maintenance and education of the complainant, and not otherwise. And that, in respect to education, the said trustee, Mrs. Walker, shall act agreeably to the wish and inclination of the complainant; it being the intent and meaning of this order, that the said money shall be paid to the said trustee, whether the complainant be kept at school, or otherwise.

 1715, ch. 39, s. 15; 1829, ch. 216, s. 5.

 1329, ch. 216, s. 7, and, since, with a capacity to exeeute powers of attorney for such purposes; 1831, ch. 305, s. 5.

 1798, ch. 101, sub ch. 1, s. 3.

 Smith v. Williamson, 1 H. & J. 149; Davis v. Jacquin, 5 H. & J. 100 ; Bowers v. The State, 7 H. & J. 32; Crapster v. Griffith, ante 7. —

 1798, ch. 101, sub ch. 12; 1807, ch. 136, s. 4.

 Eyre v. Shaftsbury, 2 P. Will. 116 ; Roach v. Garvan, 1 Ves. 158; -v.-, 2 Ves. 374; Villareal v. Mellish, 2 Swan, 536, note; The King v. Oakley, 10 East. 491; 2 Fonb. 237; Hay v. Conner, 2 H. & J. 347; Jarrett v. The State, 5 G. & J. 28. —

 1798, ch. 101, sub ch. 15, s. 20.

 Beaufort v. Berty, 1 P. Will. 706; 1 Blac. Com. by Chit. 463, note 12 ; 1798, ch. 101, sub ch. 4.

 Beaufort v. Berty, 1 P. Will. 705; Roach v. Garvan, 1 Ves. 158. —

 Beaufort v. Berty, 1 P. Will. 703 ; Vattel, b. 3, ch. 11, s. 112.

 Cox’s case, 1 P. Will. 29; In re Masters, &c. of the Bedford Charity, 2 Swan, 522.

 Storke v. Storke, 3 P. Will. 51; Roach v. Garvan, 1 Ves. 158, and Supp.; Villareal v. Mellish, 2 Swan, 533; Blake v. Leigh, Amb. 306; De Manneville v. De Manneville, 10 Ves. 61; Wellesley v. Beaufort, 3 Cond. Cha. Rep. 11; Lyons v. Blenkin, 4 Cond. Cha. Rep. 115; Shelley v. Westbrooke, 4 Cond. Cha. Rep. 126.

 1715, ch. 39, s. 10; 1729, ch. 24, s. 12.

 Decla. Rights, art. 33.

 Decla. Rights, art. 38.

 Const. U. S. amend, art. 1.

 1798, ch. 101, sub ch. 4.

 Beaufort v. Berty, 1 P. Will. 703; Storke v. Storke, 3 P. Will. 51 ; De Manneville v. De Manneville, 10 Ves. 61; Whitfield v. Hales, 12 Ves. 492; Ball v. Ball, 2 Cond. Cha. Rep. 299; Wellesley v. Beaufort, 3 Cond. Cha. Rep. 1; 2 Lond. Jurist, 66; Jones v. Stockett, ante 428.

 Mountstuart v. Mountstuart, 6 Ves. 363; De Manneville v. De Manneville, 10 Ves. 56; Lyons v. Blenkin, 4 Cond. Cha. Rep. 115; Vattel, b. 1, ch. 11, s. 114.

 Lashley v. Hog Robin. Succession, 430.

 Creuze v. Hunter, 2 Cox, 242.

 Skinner v. Warner, 2 Dick. 779; Ex parte Warner, 4 Bro. C. C. 101; Wellesley v. Beaufort, 3 Cond. Cha. Rep. 14; Lyons v. Blenkin, 4 Cond. Cha. Rep. 115.

 Somerville v. Somerville, 5 Ves. 750; Potinger v. Wightman, 3 Meriv. 68; Desesbats v. Berquier, 1 Bin, 336.

 Vattel, b. 2, c. 7, s. 85; Karnes’ Pri. Eq. b. 3, c. 8, s. 1; Ex parte Otto Lewis, 1 Ves. 298.

 Arglasse v. Muschamp, 1 Vern. 75 ; Kildare v. Eustace, 1 Vern. 419; Ex parte Otto Lewis, 1 Ves. 298; Ex parte Annandale, Amb. 80 ; Cranstown v. Johnston, 3 Ves. 170; S. C. 5 Ves. 277. In the matter of the Duchess of Chandois, 1 Scho. & Lefr. 301; Cartwright v. Pettus, 2 Chan. Ca. 214.

 Vattel, b. 2, c. 7, s. 84; Ex parte Ord. 4 Cond. Cha. Rep. 44; Logan v. Fairlee, 4 Cond. Cha. Rep. 90.

 Roach v. Garvan, 1 Ves. 158; Stephens v. James, 7 Cond. Cha. Rep. 197.

 Dagley v. Tolferry, 1 P. Will. 285 ; Butler v. Freeman, Amb. 302; Colson v. Morris, 4 Cond. Cha. Rep. 121, note.

 1798, ch. 101, sub ch. 12, s. 3.

 1816, ch. 203, s. 1.

 Anonymous, 9 Mod. 66; The United States v. Johns, 4 Dall. 416; Church v. Hubbart, 2 Cran. 187; Peake’s Evid. 73, note.
On the petition of William Winchester, and Henrietta his wife, stating, that Henry Irwin, of Pennsylvania, died there intestate, leaving real and personal estate there, and a widow, the sister of the petitioner, with four infant children, Ann. Irwin, Mary Irwin, Henry Irwin, and Ellen Irwin; that a certain Thomas T. Cromwell, was there appointed administrator of the deceased’s personal estate, and a certain Benjamin Cornelius, guardian to his infant children; and that afterwards, the■ widow, with these, her four infant children, removed into, and became residents of this state, where she died. Whereupon it was prayed, that the petitioners might be appointed their guardian. Upon which petition, by an order passed on the 29th of June, 1830, the Chancellor appointed them guardians of those infants, as prayed. It is understood that the propriety and validity of this appointment, has been repeatedly recognized in the state of Pennsylvania.