*STAPDES, J.
Michael Hart, a resident of New York, died in that state in September, 1861, possessed of a considerable real and personal estate.
By his will, which was admitted to probate in the surrogate court of New York, he appointed his wife, Frances Hart, his executrix, George A. Davis, of Ohio, the appellant Moses and Solomon Davis, of Richmond city, his executors. None of them qualified, however, except Mrs. Hart, to whom letters testamentary were granted in New York. The will was not offered for probate in this state; no doubt under an apprehension that the property here might thereby be exposed to confiscation. The appellant Moses, however, at the request of the parties interested, or a part of them, qualified as curator of the estate in Virginia. The precise time of this qualification does not appear, though it was probably in the winter of 1861 and ’62. The appellant, in his character of curator, took possession of the personal property, which was of considerable value, consisting of stocks in banks, insurance and other companies, shares, bonds, notes, and other evidences of debt. He continued to act in that capacity until the year 1868, when the will was, for the first time, admitted to probate here, and administration, with the will annexed, was committed to the appellee Wright, sheriff of the city of Richmond.
In August 1869 this bill was filed by Wright in the Circuit court of the city, against the appellant, for a settlement of his accounts as curator, and for the payment of such balance as might be found due the estate. In this suit such proceedings were had that in February 1874, a decree was rendered by the Chancery court of Richmond against the appellant for the sum of thirty thousand eight hundred and seventy-one ^dollars and thirteen cents. From this decree an appeal was taken by Moses to this court.
There are various assignments of error in the proceedings of the court below. I do not propose, however, to consider them in the order in which they are presented, or to enter into any elaborate discussion of the questions growing out of these assignments, with the exception of one of these, which will be more particularly noticed in the conclusion.
The first matter that demands attention is the amount of the decree against the appellant. He insists that it greatly exceeds the assets which came into his hands after allowing him his just credits. The objection I think is not well taken. It is in proof that in December 1861 the appellant had in his possession more than five thousand dollars belonging to the estate, which he paid to Henry and George Hart. He had also over ten thousand dollars invested in Confederate bonds, and the further sum of one thousand dollars, with all of which he is chargeable. In his letter of April 1862 *566 to Mrs. Hart, the executrix, he states that he then had in cash about twenty thousand dollars on which he was making’ interest.
The appellant’s account, as curator with the Traders Bank of Richmond, shows that between the 18th January 1862, and the 31st January 1863, he had deposited to his credit in that bank about twenty-four thousand dollars in Confederate money belonging to the estate, that the greater part was drawn out by him during the year 1862, and the entire amount by the 2d July 1863. The evidence in the cause, indeed the appellant’s own admissions, lead irresistibly to the conclusion that this money was appropriated by him, and employed in trade and speculation.
*These facts show that the report of the commissioner, upon which the pecree is based, does not over estimate the amount of the assets which came to the hands of the appellant. The only doubt I have had is, whether the appellant is not justly chargeable with a larger sum. The decree in this particular is perhaps as nearly correct as can be under all the circumstances of the case, and. does substantial justice to the parties.
Another ground of complaint is, that the court scaled the Confederate currency in the hands of the appellant, as of the date of its receipt, instead of applying the scale at the end of the year in which it was received. It is said that the law allows to a personal representative a reasonable time to make his disbursements, and during this reasonable time the estate and not the fiduciary should bear any loss resulting from a depreciation of the currency.
This may be true with respect to a fiduciary who has properly disbursed the assets, or has retained, them in his hands a reasonable time with a view to disbursement or investment; but the benefit of the rule cannot be justly extended to one who has been guilty of a devastavit by converting the assets to his own use. As it is difficult, if not impossible, in most cases to ascertain the period of conversion, and as the fiduciary plainly violates his duty in using the trust fund, he may be properly charged with the value of the currency at the time it was received. On the other hand there may be cases in which the value 'should be fixed as of the time of the conversion. No inflexible rule can be laid down on the subject. In the case before us, I am of the opinion the chancellor was warranted by the circumstances in applying the scale of depreciation at the time the Confederate currency was received by the appellant.
* Another ground of error assigned is, that the chancellor, after reducing the Confederate treasury notes to their gold value, added thereto the premium in national currency. It is argued that this practice is in conflict with the decisions of the Supreme court of the United States, which hold, that under the act of congress, treasury notes, known as “greenbacks,” constitute a legal tender in the payment of all debts.
A moment’s consideration will show that these decisions have no bearing upon the question. The act of March 3d, 1866, for the adjustment of Confederate liabilities, provides that the debt may be liquidated and settled by reducing the nominal amount to its true value at the time the contract was entered into, or at such other time as to the court or jury may seem right in the particular case. This act has been generally construed by the courts as authorizing, if not requiring, the gold value of the Con-federate notes to be ascertained. And this has been the practice throughout the state. If this course be pursued — if the Confederate debt be reduced to its value in gold, and judgment entered for the amount, it is very clear that the debtor ought not to be permitted to discharge that judgment in a depreciated currency less valuable than gold. Such a result would be unjust to the creditor, and contrary to the true intent and meaning of the statute. And yet this very result will follow if the court render a judgment for the gold value, and the debtor is allowed, > as he will be, to pay the debt dollar for dollar in depreciated legal tender notes. It was from an apprehension of the unjust working of this practice, this court adopted the rule laid down in Magill v. Manson, 20 Gratt. 527, of adding the premium to the gold value, and of giving judgment for the amount thus ascer-tained. The court does not *thereb3r undertake to prescribe the kind of money in which a debt is to be paid; but to ascertain and determine the precise amount which is to- be paid. Instead of rendering a judgment for gold, or for a sum to be paid in gold, the court enters judgment for a sum which may be paid in money, the equivalent in value of the gold. The main objection to the rule adopted in Magill v. Manson is, that the national currency may so appreciate in value between the date of the judgment and the time of payment as indirectly to increase the amount for which the debtor is liable. On the other hand, the creditor may lose by the depreciation of the currency after the rendition of the judgment. This, however, is a hazard necessarily incident to every judgment, and indeed to every obligation payable in currency rather than gold.
In order to avoid this difficulty, and with a view to attain, as far as may be, the justice of the case, this court has so far modified the rule laid down in Magill v. Manson as to authorize the debtor to pay in coin or its equivalent. This will be effected bj’’ fixing the amount of recovery under the statute in gold, and by so framing the judgment or decree as to authorize and require the debtor to discharge it in gold; or, at his option, to pay a sum in currencj' equivalent in actual value to the gold. The decree in the present case can be modified accordingly; the result will not, however, be substantially varied.
I have devoted more time to the consideration of this branch of the case than is perhaps necessary. As the question has not *567 "been discussed by this court on any previous occasion, and as counsel seem somewhat mistaken as to the ground upon which the court has heretofore proceeded, it has been deemed but just that these grounds should be now briefly stated.
* Another error assigned is the refusal of the chancellor to allow the appellant his commissions. As already stated, the appellant qualified as curator in the winter of 1861-’62. It appears that in September 1866 he laid before a commissioner his accounts for settlement, but none was made, in consequence of the removal of the commissioner from office by the military authorities from the federal government. No other settlement, before or subsequent to the time just mentioned, was ever made or attempted. The chancellor allowed the appellant his commissions subsequent to September 1866 ; but he refused to allow them for the period between T861 and 1866. In this I think he committed no error. This could be demonstrated by a reference to section 8, chapter 132, page 662, Code of 1860; act of March 14, 1862; acts of March 11, 1863; act of 1862 and 1863, page 82, and the act of March 3d, 1866.
This question must however be regarded as settled by the decision of this court in Strother v. Hull, 23 Gratt. 652, 671, in which it was held that the fiduciary was entitled to his commissions. I did not sit in that case, but regard it as a binding authority.
There are other exceptions involving mere matters of fact, not necessary to be particularly considered here. I think the chancellor was correct in overruling them.
The last and most important question in this case remains to be considered. It seems that Henry and George Hart, sons of the testator, and legatees under his will, during the war resided in Virginia. Henry Hart came to Richmond very early after the hostilities commenced. The exact date of George Hart’s arrival does not appear; but he was certainly in the state during the period of the transaction hereafter to be ^mentioned. In December 1861 the appellant paid them about five thousand and five hundred dollars. He delivered to Henry Hart in April 1862 the Confederate bonds heretofore referred to, amounting to more than ten thousand dollars, and the appellant paid him the sum of one thousand dollars in southern bank bills. Under the will of Michael Hart, they, George and Henry Hart, are entitled to legacies of five thousand dollars each. They are also residuary legatees with the other children, of the entire estate after the payment of the specific legacies.
The appellant claimed in the court below that he should be allowed credit for the payments thus made, or, at least, for so much as did not exceed the interest of George and Henry Hart under the will of their father. This claim was disallowed by the chancellor upon various grounds which will be noticed hereafter.
The appellant insists that the decree in this respect was not only erroneous but grossly unjust to him. He insists that although a curator is not strictly authorized to pay legacies, yet he will be allowed credit for those actually paid, when the rights of creditors are not prejudiced; and in this case there is no danger upon that point, as all the debts, both here and in New York, have been long since settled; that the only effect of sending the assets abroad will be to require the appellant to incur the expense and hazard of pursuing the legatees in the courts of a foreign state to obtain that redress which his own courts ought to grant him.
On the other hand, the appellee contends that the object of the ancillary administration is simply the protection of domestic creditors, and so soon as this is accomplished the residuum of the assets should be transmitted at once to the domiciliary administrator, for final settlement *and distribution. This (it is claimed) is the general rule; the exceptions to it are rare, and never occur unless it clearly appears that the transmission of the assets will be attended by some prejudice or serious inconvenience to citizens of the country where the assets are situated.
It is further contended, that until the whole estate, both here and in New York, has been fully administered and settled, it cannot be known what are the shares of George and Henry Hart; that there is nothing in the record to show that any such settlement has been made or that the debts have been paid, or that the estate is even sufficient to pay the preferred legacies ; and, under such circumstances as these, to decree the payment of these legacies here would produce endless confusion and embarrassment in the administration of the estate.
This is a mere abstract of a very able and exhaustive argument made by the counsel for the appellee. In support of his view he cites a number of authorities. The learned counsel’s main reliance is upon certain Massachusetts cases, which, it must be admitted, fully sustain his position. The first is that of Richard's adm'r v. Dutch, 8 Mass. R. 515, in which the court say, “that legatees who claim only from the bounty of the testator must resort to the country of the testator where the will was originally proved, and by the laws of which his effects are to be distributed, to obtain the bounty they claim. ’ ’
The second case is Danes, Judge v. Boylston, 9 Mass. R. 337. The court, after stating that the lex domicilii must govern in the distribution of the personal estate, say: “And this distribution is to be made under the authority of the court within whose jurisdiction the deceased had his domicil; it not being competent for a *court granting an auxiliary administration to order a distribution among the heirs and legatees.”
If these propositions of law be sound, there cannot be a question of the correctness of the decree in this case. But are they sound? I think it can be demonstrated that they are. not correct in principle, and *568 that they are not sustained by the current of authority in England or in this country. Even in Massachusetts they have been considerably modified by later decisions. “And the courts there now hold, that whether the assets shall be retained for domestic claimants or transmitted to the domiciliary administrator for distribution, depends upon the particular circumstances of each case.” Dawes v. Head, 3 Pick. R. 128-9; Sturgis v. Slacum, 18 Pick. R. 36.
In the latter case the court say, the court of the ancillary administration may order distribution according to the laws of the country where the deceased had his domicil, or it may order the balance to be transmitted to the administrator appointed in the country where he had his domicil.
The case of Harvey v. Richards, 1 Mason’s R. 381, is generally recognized as a leading authority. It was argued by Mr. Webster and Mr. Prescott as opposing counsel, and was decided by Mr. Justice Story. It is very true, as suggested by the counsel for the appellee, that no part of the assets in the hands of the ancillar3' administrator were needed by the domiciliary administrator, either to pajT debts or legacies; but Judge Story entered into an elaborate examination of the authorities, and of the principles applicable to the subject. He expressed his emphatic disapprobation of the Massachusetts cases, so much relied on by the learned .counsel. He said that whether distribution ought or ought not to be made by the ancillary administrator, should depend upon the circumstances of each case; *that -no universal rule ought to be laid down on the subject; or, at least, that the rule should be flexible, and depend for its application upon the equity of the particular case presented to the court. He asked why should not legatees and distributees be entitled to recover out of the assets here as well as creditors. It is true that legatees claim by the bounty of the testator; but it is a legal right, as fixed and vested as the right of a creditor. If it belongs to the public policy of a country to sustain the claims for debts due to its citizens, it seems no less to belong to that policy to sustain any other claims founded in justice and law. He declared he was unable to admit the rule in favor of creditors, without admitting at the same time the like rights in favor of legatees and heirs.
The only case I have been able to find in the New York Reports is that of Parsons v. Lyman, 20 New York R. 103. The opinion of the court was delivered by Judge Denio, who expressed his entire concurrence with the views of Judge Story.
In Mothland v. Wiseman, 3 Penn. R. 188, it was held that the foreign administrator, although but auxiliary, -is bound to remit the assets to the administrator of the dom-icil only in case there are no domestic claimants in the character of creditors, legatees, or next of kin; but that where these appear, the assets are to be retained for administration. This was the opinion of Chief Justice Gibson, upon a careful review of all the authorities. This decision was fully approved in Dent’s Appeal, 10 Harris’ R. 514. In that case the court went so far as to say, ‘ ‘where there are domestic claimants upon the fund their rights must be protected, and they must not be put to the expense or danger of following it into a foreign jurisdiction. And they further held that legatees and distributees not residing in the state, *but seeking their remedies in her courts, were to be regarded as domestic claimants. See also Miller’s Estate, 3 Rawle’s R. 317; Parker’s Appeal, 61 Penn. R. 478.
The learned counsel for the appellee has cited the case of Churchill et al. v. Boyden, adm’or, 17 Vermont R. 319, in which Judge Redfield stated that the prevailing practice of the courts in the ancillary administration is not to decree distribution, but to remit the funds to the principal administration. This point was not involved in the case, and this observation of Judge Redfield was therefore a mere obiter dictum. He makes no reference to any other than the Massachusetts decisions. He concedes that even here there is a discretion in the courts where the funds are found, and if they do remit them it is merely from courtesy.
Upon a careful examination of the Vermont decisions it will be found they do not sustain the practice of the Massachusetts courts as assumed in the cases so much relied on for the appellee. One of the latest upon this question is that of the Probate Court v. Kemball, 42 Vermont, in 1869; in which the court held it is the duty of the Probate court having in hand the ancillary administration to remit the assets within its jurisdiction not needed for debts and legacies within the state; thus placing debts and legacies upon substantially the same ground.
There is one other authority which seems to have escaped the researches of the counsel, and which is entitled to greater 'consideration with us than any jret mentioned. I allude to the case of Tunstall v. Pollard’s adm’r, 11 Leigh 1-35. In that case Judge Tucker, in alluding to the doctrine announced in Richards v. Dutch, 8 Mass. R. 506, and Dawes v. Boylston, 9 Mass. R. 337, that legatees who claim only from the bounty of the testator must resort to the country of *the testator, to obtain the bountj' they claim, said: “These decisions appear to me unreasonable and extravagant, and they are rejected by Judge Story himself in the case of Harvey v. Richards, 1 Mason’s R. 381, 420. They are opposed, too, by the decisions in other states (Guier v. O’Daniel, 1 Binn. 349, in note), and by the cases collected by the court in Harvey v. Richards. It would be unreasonable indeed that a legatee should be compelled to go abroad to get payment out of the assets that are here in the hands of an administrator who has duly qualified in our courts and is within our jurisdiction. ’ ’ In this opinion the other judges fully concurred. And although this precise question was not involved in that case, still the *569 opinion is entitled to great consideration, in the absence of any express contrary decision.
As already stated, the English cases are equally explicit upon the subject of the rights of legatees residing within the state of the ancillary administration. I do not propose, however, to cite them, as they may be seen in Harvey v. Richards, where they are reviewed by Judge Story. It will be sufficient to give a single extract from a work of high authority, which contains the result of the English decisions. In 2 Williams on Executors, page 1415, it is said: “Although the new administration is treated as merely ancillary to the foreign administration, so far as regards the collection of the effects and the proper distribution of them, still, however, the new administrator is made subservient to the rights of creditors, legatees and distributees, who are resident within the country where it is granted; and the residue is transmitted to the foreign country only when a final account has been settled in the proper tribunal where the new administration is granted, upon the principles adopted by its own laws *;n the application and distribution of the assets found there. See also Preston v. Melville, 8 Clark & Finn. 1, 13.
Other authorities might be named to the same effect. These are sufficient to show that the doctrine of the earlier Massachusetts cases is not good law. They show, indeed, that there is no general inflexible rule upon this subject; that whether the assets will be retained or remitted for the payment of legacies or distribution, must depend upon the circumstances of each case. The question is one not of jurisdiction, but simply of judicial discretion. Every state determines for itself the manner in which property within its limits shall be disposed of. Although one administrator or executor may be termed principal, and the other ancillary, each in fact is principal, because each is independent of the other, and derives his power from equally independent sources. Neither has any control of the assets beyond the limits of his state. If the court of the ancillary administrator consents to a transmission of the assets abroad, it is a mere matter of courtesy, and not because there is any obligation to do so. That courtesy ought never to be exercised to the injury or inconvenience of domestic claimants, whether they be creditors, legatees or dis-tributees. The one has as much right to the protection of the government as the other. It is not a just principle to subject our own citizens to the expense, trouble and hazard of redress in foreign tribunals, when our own courts are entirely competent to afford it. The foreign claimants who come here insisting upon a transmission of the assets to a distant state where there are domestic claimants also, ought to be required to show that such transmission is indispensable to the purposes of justice. | They ought to show that distribution j cannot be *made here without injury, | or at least, great inconvenience to parties interested in the estate. The burden should be upon them. Instead of permitting them to take away the fund by invoking general principles of some supposed international comity, it ought to be incumbent upon them to make a case for the interposition of the court in their favor. If there is to be any general rule on the subject, I would be for establishing this as the proper one. This is the view taken by Mr. Justice Story, who declares that it is not only sustained by principles of public policy, but stands commended by its intrinsic equity.
In the present case, however, it is not a legatee who is seeking payment of a legacy. It is a much stronger case. It is that of a fiduciary who has made advancements to legatees under circumstances as will be hereafter seen, which appeal very strongly to the court. The question is, whether he shall be required to remit the assets abroad that he may there be decreed to receive them again.
It is said, however, that the appellant was a mere curator, whose duties are very limited, and whose authority does not extend to the payment of legacies. This may be true with reference to creditors. But the question here is whether, having made the payments to legatees, the appellant shall have credit as against them for such payments. In a controversy between George and Henry Hart and the appellant no court would compel him to pay the fund to them and put him to his suit to recover it again. If the New York court may decree in his favor so may this court, if it may decree distribution at all.
It must be conceded, at any rate, that the appellant, to the extent of his advances, is the equitable assignee of the parties paid, and stands in their shoes.
*The appellant was executor under the will. But he could not qualify here as such because it was deemed unsafe to record the will. He could not qualify as administrator, because he could not take an oath that the deceased, so far as he knew, died without a will. And so a very limited form of administration was assumed. But surely it could not have been intended that George and Henry Hart should wait until the termination of a protracted war before they could receive one dollar of the large and valuable estate left them by their father. The learned chancellor very correctly holds that the appellant was justified in making the investment in Confederate bonds; and yet it is absolutely certain that they would have been utterly lost to the estate had they not been delivered to Henry Hart. Every dollar paid these legatees was so much gained to the foreign claimants; and it does not become them to make complaint of the conduct of the appellant in this respect.
It is said, however, that the fund here may be needed in New York for the payment of debts and the preferred legacies. The appellee states in his bill that the testator owed but few debts, and he is informed *570 that all of them were paid by the executors, who qualified in New York. There is nothing in the record throwing the slightest doubt upon the accuracy of this statement, and it must be taken as true. In regard to the legacies there is more difficulty. I have not a doubt but that they have been satisfied long ago. The estate, as is conceded, was a very valuable one both here and in New York. It appears that the appellee on the 18th May 1872 sent to the executrix in New York about twelve thousand dollars, and there is still in his hands the additional sum of twelve thousand two hundred and thirty-one dollars. Besides this, if the appellant *is allowed all his credits he will be indebtéd to the estate some ten or fifteen thousand dollars. Although this suit has been pending more than five years, during this time we hear no complaint from the executrix or either of the legatees in New York: the Chancery court was furnished with no statement or account to enable it to ascertain whether the funds are needed abroad for the payment of debts or legacies. It is not even asserted that they are, except in the way of suggestion in the argument for the appellee.
Under these circumstances the court without further investigation might well allow the appellant the credits claimed by him if there was no other difficulty in the way. But Henry Hart, whose general pecuniary legacy is much less than the amount he received from the appellant, is a residuary legatee of the entire estate, in conjunction with the other children after the payment of the pecuniary legacies. With a view to remove all difficulty upon this point, and indeed to prevent any possible injury or loss, an inquiry can be directed to ascertain whether any part of the assets are needed in New York to pay debts or legacies; and further, to ascertain what portion of the estate George and Henry Hart are entitled to under the will of their father. This information can.no doubt be easily obtained. It will enable the court to act understandingly upon the rights of the parties.
This course is certainly more reasonable and equitable than to require the appellant to pursue the legatees in a foreign state to recover what he has already paid. If the appellant is compelled to raise the large sum decreed against him before he can claim against the legatees, it is highly probable both he and his security will be reduced to bankruptcy. And when the funds reach New York it is impossible to foresee the ^obstacles that may be thrown in the way of subjecting any part of them to the appellant’s claim. How can we say that he will there obtain credit for the Confederate bonds delivered to Henry Hart. The decisions of the federal courts repudiate investments of this kind, and we cannot say the New York courts will not follow their example. No rule of law or principle of international comity requires us to expose a citizen of this state to hazards of this character, and it ought never to be done unless in a case of overwhelming necessity'. If the accounts have all been settled in New York, and the interests of each of the legatees ascertained, it will be an easy matter to determine the extent of appellant’s credits. If, on the other hand, the administration there has not been settled, a sufficient sum ought to be retained here for appellant’s indemnity until the shares of George and Henry Hart are ascertained. No injury can arise from this course, for if the funds are remitted to the domiciliary administration they would have to await the settlement of the final account before distribution can be made. The appellant ought to have the amplest opportunity of showing the state of the New York accounts, and of establishing his credits. I say the appellant, because his payments to the legatees were not strictly within the line of his duty as curator, and it is therefore incumbent upon him to obtain the necessary information from abroad in regard to the state of the accounts. The appellant is himself a legatee to the extent of five hundred dollars under the will. He is certainly entitled to a credit for this in his settlement, unless it is made to appear that the assets are required for the payment of debts or the preferred legacies. Until the inquiries herein directed have been made, the decree of the chancery court will be suspended as to a part *of the fund found due by the appellant. The security of the lien of the decree will thus be preserved to the appellee.
In the meantime, George Hart and Henry Hart must be made parties to the suit, that they may have an opportunity of being heard upon the question of the payments made to them. This disposes of all the questions presented to this court; one of them has been considered at much length, because it was argued very elaborately by the learned counsel for the appellee, and the judge of the Chancery court arrived at a different conclusion from what is here expressed. The importance of the case has justified, and perhaps required, a longer discussion than otherwise would have been deemed necessary.
The case must be remanded to the Chancery court, to be proceeded with in conformity with the principles herein announced.
MONCURE, P., and CHRISTIAN, J., concurred in the opinion of Staples, J.
ANDERSON and BOUEDIN, Js., concurred in the opinion except as to the commissions; as to which they referred to Strother & als. v. Hull & als., 23 Gratt. 652.
Decree reversed.